No. 101,551

STATE OF KANSAS, *Appellee*, v. ANTWAN T. PEPPERS, *Appellant*.

(276 P.3d 148)

Opinion filed May 4, 2012.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jason E. Geier*, assistant district attorney, argued the cause, and *Darren E. Root*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Antwan T. Peppers appeals his convictions of one count of first-degree premeditated murder and one count of attempted first-degree murder.

Peppers alleges reversible error in the district judge's admission of gang affiliation evidence; the content of instructions given to the jury on the gang affiliation evidence and on the burden of another trial; and the prosecutor's closing argument because of what he views as a comment on facts not in evidence, an endorsement of a victim's credibility, a shifting of the burden of proof, and expres-

sions of a personal opinion on guilt. As fully discussed in this opinion, we conclude that none of Peppers' challenges to his convictions warrants reversal.

Peppers also challenges his consecutive hard 50 life sentence for first-degree murder and 272 months' imprisonment for attempted first-degree murder as unconstitutional, because they were based on criminal history not proved to a jury beyond a reasonable doubt. We have rejected this argument in numerous cases, starting with our opinion in *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002), and we are not inclined to revisit or revise this holding. Our opinion will not further discuss Peppers' argument on this sentencing issue.

## FACTUAL AND PROCEDURAL BACKGROUND

Peppers stands convicted by a jury of the first-degree premeditated murder of Jermaine E. Cunningham and the attempted first-degree murder of Terrell Dontae Hayes-Osby. The charges stem from a July 2006 late-night shooting outside of Terry's Bar and Grill (Terry's) in Topeka.

Before trial, Peppers filed a motion in limine to prohibit improper comments by the prosecutor. Peppers requested that the court "instruct the prosecutor . . . to refrain from making improper, misleading, inflammatory or irrelevant statements, comments or insinuations at any time during the voir dire or trial of this matter." At the motion hearing, the prosecutor agreed to the admonition, as long as the same admonition applied to the defense. The district judge granted the motion, noting that "[c]ertainly, defendant is required to follow the same or similar rules although I think the large majority of the cases apply to prosecutors and not to defense counsel."

Also, before trial, Peppers filed a motion in limine to exclude "[a]ny references to prior criminal history and/or alleged prior criminal activity or conduct, charged or uncharged . . . , [and a]ny reference to alleged gang affiliation of Mr. Peppers, . . . Hayes-Osby, . . . Cunningham or any witnesses in this matter."

At the hearing on the motion, Peppers argued that the prejudicial effect of the gang affiliation evidence would outweigh its

probative value and would deny Peppers his right to a fair trial. Peppers also argued that this was not a case of "gang warfare" and that the evidence was not needed to explain any witness bias. Peppers asserted that, instead, this was a case of "[f]riend shoots friend and there's payback."

The State responded that the admission of gang evidence did not fall within K.S.A. 60-455 and was not confined by it. It also argued that evidence of gang affiliation was material and relevant to motive. The State contended that its theory of the case was gang retaliation and, therefore, gang affiliation evidence was relevant to explain an otherwise inexplicable shooting.

The district judge granted Peppers' motion as to evidence of any prior criminal activity. The district judge took the question of gang affiliation evidence under advisement, and Peppers filed additional argument in support of his motion, arguing that the State's theory of the case was not supported by the State's witnesses.

After a second hearing, the district judge denied Peppers' motion as to the gang affiliation evidence. The district judge reasoned that " '[e]vidence of gang membership is admissible if relevant,' " quoting *State v. Ross*, 280 Kan. 878, 885, 127 P.3d 249 (2006), *cert. denied* 548 U.S. 912 (2006). She further cited *State v. Goodson*, 281 Kan. 913, 922, 135 P.3d 1116 (2006), for the proposition that gang evidence may be material if the evidence "provides a motive for [an] otherwise inexplicable act," "shows witness bias," or explains "part of the chain of events." The district judge concluded that the gang evidence at issue in this case provided a reason for a meeting between Peppers and victim Hayes-Osby and provided an alternative motive for the shooting.

Peppers renewed his objection to the introduction of gang affiliation evidence after opening statements at trial. The district judge again denied the motion, but she granted Peppers a continuing objection.

Detective Bryan Wheeles of the Topeka Police Department testified in Peppers' trial about a homicide that occurred earlier in the same day as the shootings of Cunningham and Hayes-Osby. Hayes-Osby was the suspect in the earlier crime, and the victim was Trevor Antwan Harness. Wheeles became peripherally in-

volved in the investigation of the later Cunningham and Hayes-Osby shootings because it overlapped with the investigation of the Harness homicide. The gun used to shoot Harness was recovered at the scene of the later crimes. Hayes-Osby eventually confessed to killing Harness.

Hayes-Osby also testified in Peppers' trial. He said that he knew Harness from an "organization" called the "Four Corner Hustlers," also known as the "Solids 4." The Solids 4 associated with the "Traveling Vice Lords" or "TVLs." Hayes-Osby testified that the Solids 4 and the TVLs were part of the same larger organization.

As a member of the Solids 4, Hayes-Osby said he was responsible for following certain rules and regulations. "Chiefs" of such organizations imposed sanctions and penalties for violations. The Topeka chief of the TVLs was Peppers. Because Harness was a member of the TVLs and owed Hayes-Osby money and crack cocaine, Hayes-Osby had gone to TVL Chief Peppers to seek payment. Peppers, Hayes-Osby said, eventually told Hayes-Osby to "[chalk] it up as a loss."

On the morning of the homicides, Hayes-Osby and Harness were involved in an incident during which Hayes-Osby pointed a gun out of the car Harness was driving after a third person had pointed a gun at their car. No shots were fired. Harness drove away from the incident while arguing with Hayes-Osby about drawing and pointing the gun. Hayes-Osby testified that, when he and Harness got out of the car, "I pulled a gun out on him and I told him to pay me my money. . . . He was acting like he didn't want to pay me so I told him to empty his pockets. He acted like he was going to go into his pockets and then he reached for the gun. I shot him."

After he shot Harness, Hayes-Osby went to his cousin's house in Johnson County. While he was there, Peppers called and said that he had heard Hayes-Osby shot Harness. Harness was also known as "Little Twan" because he was a close friend and TVL associate of Peppers. Hayes-Osby agreed to come back to Topeka and meet with Peppers to discuss the organizational rule violation Hayes-Osby had committed by killing Harness. Hayes-Osby then called his friend Cunningham, a member of the Bloods, to drive him.

Once back in Topeka, Hayes-Osby again talked to Peppers by telephone, and the two planned to meet at Terry's. Cunningham and Hayes-Osby went inside Terry's but left when, according to Hayes-Osby, "people was acting like they didn't want to serve me." While walking back to their car, Hayes-Osby recognized Peppers walking toward him on the street with two other people. Hayes-Osby testified: "I told [Cunningham], let's get out of here. I ain't trying to fool with these men right now." Hayes-Osby got into the passenger side of the front seat and Cunningham got into the driver's side. Then the three men on the street ran up behind the car and started shooting.

Hayes-Osby saw two bullets go through Cunningham's head, and Hayes-Osby was shot once in the arm and three times in the back. Hayes-Osby said he then took Cunningham's gun, which Hayes-Osby had used earlier in the day to kill Harness, and got out of the car. As he emerged, he said, he looked back to see who was shooting at him and saw part of the face of the man standing behind the car on the driver's side. He identified this man as Peppers. Hayes-Osby said he tried unsuccessfully to return fire and then threw Cunningham's gun under a nearby truck. When Hayes-Osby was refused readmission to Terry's, he began walking toward a liquor store. Police then arrived on the scene.

The State charged Hayes-Osby with the murder of Harness, and Hayes-Osby eventually entered into a plea agreement under which he would testify against Peppers and receive a recommendation of a 75-month rather than a 154-month sentence. It took more than a year to reach the plea agreement. In the intervening time, Hayes-Osby exchanged letters with Peppers in which the two discussed an alternate deal between themselves: Peppers would testify that Cunningham murdered Harness, in exchange for Hayes-Osby refusing to testify against Peppers. This correspondence, Hayes-Osby said, included one letter in which Peppers warned Hayes-Osby not to testify and said that doing so would be an organizational rule violation punishable by death.

On cross-examination at Peppers' trial, Hayes-Osby testified that the shootings of Harness, Cunningham, and himself were not gang-related. He also testified that he did not remember exactly what

he had originally told police. Hayes-Osby said that Cunningham was buying marijuana on the night of the shootings and that he and Cunningham had already smoked some before they went into Terry's. He also testified that he had used Ecstasy, "wet," and drunk Hennessy on the day of the crimes. Hayes-Osby acknowledged that the man he identified as Peppers had his face covered except for his eyes. He also admitted that part of a statement he had given to police a year and a half after the crimes was false.

On redirect examination, Hayes-Osby testified that he did not believe the Solids 4 or the TVLs were gangs, but that the shootings were in fact related to the Solids 4 and TVLs "associations." He identified Peppers' telephone number as appearing on his own telephone's log three times before the shooting.

Three police officers testified that, while Hayes-Osby was in the hospital after the crimes, he told them that Peppers was the man who shot him.

Two other State witnesses in Peppers' trial also identified Peppers as the shooter.

One, LaTiseia Stano, acknowledged that she had been smoking marijuana and crack cocaine and had been drinking on the night of the shooting. She testified: "I was sitting in a car [outside of Terry's] getting high and I heard shots and I turned around and I seen people running and I, I left." Stano identified Peppers as one of the men she saw shooting. She admitted that she had previously testified she was not present at the scene because she was scared. Stano said she was incarcerated at the time of trial, but she denied having any agreement with the State for more favorable treatment in exchange for her testimony.

The other witness who identified Peppers, Stacey Lewis, acknowledged that she had been drunk on the night of the shooting. She testified that she was in an alley across the street from Terry's to buy crack cocaine when she saw a parked car with "Little Man" and "Cream" inside. "Little Man" and "Cream" were street names for Cunningham and Hayes-Osby. Lewis returned her attention to her drug transaction and then heard gunshots. When she looked back toward the car, she saw two shooters, one of whom she recognized as Peppers by "the way he moved." Lewis then ran from

the scene. When Lewis was arrested about a month later, she asked law enforcement "if they had ever caught the person who killed Little Man." When the police told her no, she told them she knew the murderer was Peppers. Lewis testified that she was given immunity from drug charges for her purchase of crack cocaine on the night of the shooting in exchange for her testimony at Peppers' preliminary hearing. She said she did not want to testify because she was frightened for her life.

Other State witnesses at Peppers' trial testified to hearing or seeing the shooting but could not identify Peppers as a shooter. Teresa Stormann testified to seeing two men in Terry's and then hearing gunshots shortly after they left. Candelario Marquez, who was sitting on a bench across the street, saw three people walk up and start shooting at the car. Felipe Reyes Marquez, who was with Candelario, saw two "blacks" with guns start shooting from behind the car. Oscar Mendoza, who was with Candelario and Marquez, heard gunshots and saw a man run past him as Mendoza fled the scene.

State witness Jesse Hall corroborated the State's case in other particulars. He testified that he saw Cunningham at Cunningham's grandmother's apartment in Topeka earlier on the evening of the shooting. When Cunningham left, he said he was going to Terry's with Hayes-Osby. Hall also left and went to get a friend to go to Terry's. On his way there, he heard five or six gunshots.

Sued White, Cunningham's cousin, testified that two cars came by his house with people looking for Hayes-Osby on the afternoon of the shooting. White first testified that he could not remember identifying Peppers but was recalled to the witness stand and testified that he did see Peppers and said he had testified otherwise before because he "didn't want to be killed."

Dawn Diggins, Peppers' ex-girlfriend, testified that officers came to her residence on the day after the shooting to look for Peppers. Three phone calls were made late on the night of the shooting to Hayes-Osby's number from a cell phone owned by Diggins but used by Peppers.

Paul Kelley also provided testimony during the State's case over a defense objection. Kelley met Peppers in federal prison in Flor-

ence, Colorado. Before Peppers left Colorado, he told Kelley: "I hope they don't bring up this body I got in the State." Kelley said he sought additional information: "I asked him what body are you talking about and he said he got into it with a dude, him and his little homie got into it with a dude about some money and I guess the dude seen his homie earlier and killed him" and "later on towards the night, they seen the dudes pull up and—he said they seen the dudes pull up and he dumped on" them, meaning shot at them, killing one and wounding the other. Kelley testified that he had no connection to the state of Kansas. Specifically, he said he had not read Kansas newspapers or watched Kansas television, including Kansas news. Kelley also testified that he did not enter into an agreement with the State in exchange for his testimony, but he admitted that he was attempting to obtain a reduction in his federal sentence.

Peppers did not testify at his trial, and defense counsel called no other witnesses.

During discussion of jury instructions at the conclusion of trial, the district judge reiterated that she allowed admission of gang affiliation evidence because it "showed motive" and because "it formed parts of the events surrounding the commission of the crime." Peppers sought a limiting instruction but objected to language permitting the jury to consider the evidence where it formed "part of the events surrounding the commission of the crime." The State took the position that no instruction was necessary but assented to the judge's wording. The district judge rejected the defense objection and gave the following limiting instruction:

"Evidence has been introduced that the defendant is a member of a particular gang. Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. Such evidence was received and may be considered by you only for the purpose of determining if it tends to show part of the events surrounding the commission of the crime or the motive of the person who committed the crimes, if any, of which the defendant is accused. For the purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose."

The district judge also gave the jury an *Allen*-type instruction including the language "Another trial would be a burden on both sides." Before doing so, she asked counsel for both sides: "[D]o you want an *Allen* instruction? I just decided that if both counsel, sets of counsel want it; I give it. If anybody objects, I don't give it." The State responded "Sure" to the instruction. The district judge then went on: "Defense, do you wish to have one?" Peppers' counsel reviewed the instruction and concluded: "We don't have any objection."

During closing argument, the prosecutor told the jury that the "only way" Hayes-Osby would get the benefit of his bargain with the State—"the reduction of 75 months' recommendation"—was to "speak the truth when he takes that stand." He also said that Kelley must have received the information about the crimes that he relayed during his testimony from Peppers. If the information had been published, "we would have seen a copy of it. That information wasn't out there, Ladies and Gentlemen." The prosecutor also said that the jury should find Peppers guilty "because he did it" and said, "The point is, is there any evidence otherwise that tells you something different about what [Hayes-Osby] told you happened?" The prosecutor asked jurors if they believed the police and the district attorney's office conspired to convict Peppers of crimes he did not commit and then said, "No, that's not what happened." The prosecutor also said during the concluding portion of his closing argument: "When you come back in after your deliberation after reviewing the evidence, you need to come in, you need to look at the defendant, and you need to tell him he's guilty and you need to look him in the eye and say you are guilty of murder and you are guilty of attempted murder because he is."

## DISCUSSION

### Admission of gang affiliation evidence

Gang affiliation evidence is admissible if relevant. *State v. Brown*, 285 Kan. 261, 297, 173 P.3d 612 (2007) (citing *State v. Conway*, 284 Kan 37, 47, 159 P.3d 917 [2007]; *State v. Ross*, 280 Kan. 878, 885, 127 P.3d 249 [2006]). Relevant evidence is defined by statute as evidence that is both material and probative. K.S.A.

60-401(b). We review whether evidence is material under a de novo standard. *State v. Shadden,* 290 Kan. 803, 817, 235 P.3d 436 (2010). Materiality addresses whether " 'a fact . . . has a legitimate and effective bearing on the decision of the case and is in dispute.' " *State v. Reid,* 286 Kan. 494, 505, 186 P.3d 713 (2008) (quoting *State v. Garcia,* 285 Kan. 1, 14, 169 P.3d 1069 [2007]). In other words, a fact is material if it is " 'significant under the substantive law of the case and properly at issue' " *Reid,* 286 Kan. at 505 (quoting *Goodson,* 281 Kan. 913, 922, 135 P.3d 1116 [2006]). We review whether evidence is probative under an abuse of discretion standard. *Shadden,* 290 Kan. at 817-18. Evidence is probative if it has " 'any tendency in reason to prove any material fact.' " *State v. Houston,* 289 Kan. 252, 261, 213 P.3d 728 (2009) (quoting K.S.A. 60-401[b]). "For evidence of gang affiliation to be admissible there must be sufficient proof that gang membership or activity is related to the crime charged." *State v. Tatum,* 281 Kan. 1098, Syl. ¶ 3, 135 P.3d 1088 (2006). Even if evidence is deemed relevant, it may be excluded if it is more prejudicial than probative. See *State v. Inkelaar,* 293 Kan. 414, 424, 264 P.3d 81 (2011). We review a district judge's weighing of prejudice and probative value for an abuse of discretion. 293 Kan. at 424.

Peppers first challenges this court's previous rulings that admission of gang affiliation evidence is not subject to further analysis—including possible exclusion or limiting instruction—under K.S.A. 60-455 on other crimes and civil wrongs. See *Conway,* 284 Kan. at 48, 50 ("The legislature specifically limited the admissibility of evidence of crimes and civil wrongs in K.S.A. 60-455; no similar legislative statement exists with regard to evidence of gang affiliation."); see *Ross,* 280 Kan. at 886; *State v. Gholston,* 272 Kan. 601, 614, 35 P.3d 868 (2001); *State v. Hooks,* 251 Kan. 755, 765-66, 840 P.2d 483 (1992); *State v. Bailey,* 251 Kan. 156, 166, 834 P.2d 342 (1992), *modified on other grounds by State v. Willis,* 254 Kan. 119, 864 P.2d 1198 (1993). He argues that jurors naturally associate gang membership with criminal activity, and thus evidence of gang affiliation needs to be treated like other evidence likely to be used by jurors as irrelevant proof of a defendant's general propensity for wrongdoing. In support, Peppers cites cases from other jurisdic-

tions in which courts have noted the connection between gangs and criminal activity. See *United States v. Cavera*, 550 F.3d 180, 204 (2d Cir. 2008); *Castenada v. Olsher*, 33 Cal. Rptr. 3d 827, 836 (Cal. App. 4th Dist. 2005); *Medina v. Hillshore Partners*, 40 Cal. App. 4th 477, 481 (Cal. App. 2nd Dist. 1995), K.S.A. 2010 Supp. 21-4704(k), which allows enhancement of a sentence for a felony connected to gang activity.

We are unpersuaded that we should depart from our precedent on this point. As we said in *Conway*, 284 Kan. at 50, the legislature has demonstrated no inclination to treat gang affiliation evidence in the same way it treats evidence of other crimes and civil wrongs. Although evidence of a defendant's gang affiliation certainly may be prejudicial, so is most evidence sponsored by the State in any criminal trial. If the evidence is nevertheless relevant—*i.e.*, material and probative—and not *unduly* prejudicial, it may be admitted. See, *e.g.*, *State v. Dixon*, 289 Kan. 46, 70, 209 P.3d 675 (2009) (not all inculpatory evidence qualifies as *unduly* prejudicial).

Peppers next challenges the gang affiliation evidence in this case as forbidden res gestae. Peppers cites *State v. Ventris*, 289 Kan. 314, 315, 212 P.3d 162 (2009), which, in turn, relied upon our decision in *State v. Gunby*, 282 Kan. 39, 59-63, 144 P.3d 647 (2006), for the statement that "res gestae is no longer a valid independent legal basis for admitting evidence."

Peppers over-reads *Gunby*, and therefore *Ventris*.

In *Gunby*, this court departed from its previous practice of employing res gestae to circumvent the rules for admission of other crimes and civil wrongs evidence under K.S.A. 60-455 as well as the prohibition on hearsay. With regard to evidence of other crimes and civil wrongs, we said: "Having explained the correct interpretation of K.S.A. 60-455, we . . . reject res gestae as a legitimate independent basis for the admission of other crimes and civil wrongs evidence in Kansas. Any other crimes and civil wrongs evidence that may be characterized as res gestae should henceforth be analyzed under K.S.A. 60-455." 282 Kan. at 59-60. More generally, *Gunby* stands for the principle that the admission of res gestae evidence should be governed by the same rules of evidence controlling admission of other evidence: "The concept of res gestae

is dead as an independent basis for admissibility of evidence in Kansas. That evidence may be part of the res gestae of a crime demonstrates relevance. But that relevance must still be measured against any applicable exclusionary rules." 282 Kan. at 63; see *Ventris*, 289 Kan. at 315.

Peppers extrapolates from *Gunby* that the admission of gang affiliation evidence to explain events surrounding the commission of a crime violates this court's prohibition on res gestae. This is incorrect. Our decision in *Gunby* eliminated res gestae as an *independent basis* for the admission of evidence. It did not eliminate the admission of evidence of events surrounding a commission of the crime under the applicable rules of evidence. In fact, as noted by the State, this court has determined that gang-related evidence can be admissible when the evidence "forms a part of the events surrounding the commission of the crime" in post-*Gunby* cases. See *Brown*, 285 Kan. at 297 (citing *Goodson*, 281 Kan. at 922); see also *Tatum*, 281 Kan. at 1109; *Winston*, 281 Kan. at 1135.

Peppers next challenges the district judge's determination that the gang affiliation evidence was relevant, *i.e.*, both material and probative. He relies on statements in earlier cases that suggest admissible gang evidence is limited to certain categories. See, *e.g.*, *Goodson*, 281 Kan. at 922-23 ("[G]ang evidence may be material, and, therefore, relevant when the evidence provides a motive for an otherwise inexplicable act, forms a part of the events surrounding the commission of the crime, or shows witness bias."). Again, we have been misunderstood. Although certain of our earlier cases on gang evidence arose in particular circumstances, a list of those circumstances does not exhaust the possibilities when gang evidence is relevant and permissible. See *Brown*, 285 Kan. at 297-300.

In Peppers' case, the district judge determined that the gang affiliation evidence provided a reason for the proposed meeting between Peppers and Hayes-Osby and provided an alternative motive for the shooting. The district judge later reiterated that the gang affiliation evidence was admissible because it "showed motive" and because "it formed parts of the events surrounding the commission of the crime."

The district judge correctly determined that the gang affiliation evidence was material. Because Peppers defended only by holding the State to its high burden of proof beyond a reasonable doubt, as a matter of law, Peppers' identity and opportunity and motive had a " 'legitimate and effective bearing on the decision of the case' " and were in dispute. See *Reid*, 286 Kan. at 505 (quoting *Garcia*, 285 Kan. at 14), 507 (motive per se material fact); see also *State v. Carapezza*, 286 Kan. 992, 999, 191 P.3d 256 (2008) (State may admit evidence of motive even though motive not element of offense).

We also see no abuse of discretion in the district judge's determination that the gang affiliation evidence was probative. Gang affiliation, hierarchy, and rules explained why Cunningham, Hayes-Osby, and Peppers ended up outside of Terry's simultaneously. Hayes-Osby had agreed to meet Peppers there because Peppers knew that Hayes-Osby had killed Harness. Hayes-Osby also knew that gang protocol made him subject to sanctions for the killing, to be decided by Peppers as chief of the TVLs. The necessity of the meeting arose out of gang life, and it was probative of Peppers' identity and opportunity to shoot at Hayes-Osby and the person with him, Cunningham. Gang rule enforcement or retaliation also provided potential explanation for why Peppers, in particular, would shoot Hayes-Osby and Cunningham, *i.e.*, it demonstrates motive. This conclusion is consistent with several cases from this court in which we explained that gang evidence may be admissible if it is relevant to motive. See, *e.g.*, *Brown*, 285 Kan. at 266; *Conway*, 284 Kan. at 50-51; *Tatum*, 281 Kan. at 1108-09; *Winston*, 281 Kan. at 1129; *Lowe*, 276 Kan. at 963; *Gholston*, 272 Kan. at 614-15. Peppers argues that the evidence supported another motive—the close friendship between Peppers and Harness and thus Peppers' compulsion to avenge his friend's murder—which means the crimes were not "otherwise inexplicable." See *Gholston*, 272 Kan. at 615. Again, gang evidence need not fall into specific categories that happened to arise in previous cases in order to be relevant and admissible. The probative value of the gang evidence admitted here for the motive advanced under the State's theory was not lessened or erased by its probative value for the motive under an alternate

theory. Evidence can be relevant to establish motive even if more than one theory or motive is presented. *State v. Hughes*, 286 Kan. 1010, 1022, 191 P.3d 268 (2008).

The record before us also demonstrates that the shootings were gang-related. Despite Hayes-Osby's effort to distance himself from the term "gang," he admitted that the shootings were related to the "associations" he described. Hayes-Osby's testimony revealed that he was a member of the Solids 4, which associated with the TVLs. Peppers was the "chief" of the TVLs, while Harness was a member. Hayes-Osby also testified that Harness owed him money and crack cocaine, which he had attempted unsuccessfully to collect through Harness' superior, Peppers. Even if Peppers had determined that Hayes-Osby would receive a punishment for killing Harness other than summary execution, other testimony by Hayes-Osby demonstrated that the punishment for certain other gang violations carried a penalty of death.

We now turn to the final step in the analysis of the admission of gang affiliation evidence or, for that matter, any evidence: undue prejudice.

The probative value of gang affiliation evidence must be weighed against its potential for prejudice. K.S.A. 60-445; *Shadden*, 290 Kan. at 817-18. "[T]he prejudicial effect of such evidence may be cured by a limiting jury instruction," although a district court is not required to *sua sponte* give a limiting instruction on gang affiliation evidence. *Brown*, 285 Kan. at 300 (citing *Ross*, 280 Kan. at 887-88; *Conway*, 284 Kan. at 51). The giving of a limiting instruction in the context of gang affiliation evidence is "one of many factors," not the sole factor, that a court ought to consider in determining prejudice. *Conway*, 284 Kan. at 47-48 (discussing *Ross*, 280 Kan. at 888). A district judge's balancing of probative value and prejudice is reviewed for an abuse of discretion. *Shadden*, 290 Kan. 817-18.

Here, the prejudicial effect of the gang evidence was limited by the district judge's jury instruction. The court instructed the jury *not* to consider the gang affiliation evidence to prove "that [Peppers] is a person of bad character or that [Peppers] has a disposition to commit crimes" and instead to consider the evidence "only for

the purpose of determining if it tends to show part of the events surrounding the commission of the crime or the motive of the person who committed the crimes, if any, of which the defendant is accused." "The district judge's . . . admonition to the jury emphasized the legitimate purpose of the admission." *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 (2011). This court "generally presume[s] jurors follow the instructions given them in the district court." *Race*, 293 Kan. at 77 (citing *State v. Becker*, 290 Kan. 842, 856, 235 P.3d 424 [2010]).

Assuming that the jury properly followed the judge's instructions in this case, the risk of undue prejudice was greatly reduced. And the probative value side of the balance on the gang affiliation evidence had substantial weight. The evidence supported Peppers' identity and opportunity by tying him to the scene of the crime and supported at least one of his possible motives. The district judge did not abuse her discretion by admitting the gang evidence with a limiting instruction.

*Content of Limiting Instruction on Gang Affiliation Evidence*

"[A]bsent a request for a limiting instruction concerning gang evidence and absent any objection for the failure to give a limiting instruction on gang evidence, a trial court is not obligated to give such an instruction." *Conway*, 284 Kan. at 50. If a party objects to an instruction at trial,

" 'the instruction will be examined on appeal to determine if it properly and fairly states the law as applied to the facts of the case and could not have reasonably misled the jury. In making this determination an appellate court is required to consider the instructions as a whole and not isolate any one instruction.' *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009)." *State v. Bailey*, 292 Kan. 449, 455, 255 P.3d 19 (2011).

Peppers objected to the limiting instruction on gang evidence because of its language permitting consideration "for the purpose of determining if it tends to show part of the events surrounding the commission of the crime." Peppers repeats his argument on appeal that "this is essentially the definition of 'res gestae' " and, therefore, the instruction did not " 'properly and fairly' state the law." Peppers also argues that "because the phrase 'to show part

of the events surrounding the commission of the crime' is incredibly broad and extremely vague, the instruction likely misled the jury."

As addressed in the preceding section, Peppers' res gestae objection is without merit. Although the instruction's wording could have been smoother, it was not incorrect or misleading. We applaud the district judge's effort to contain undue prejudice and see no error when the instruction is read in the context of this case.

*Instruction that Another Trial Would be a Burden on Both Sides*

Including the language "another trial would be a burden on both sides" in an *Allen*-type instruction constitutes error, because the language is misleading, inaccurate, and confusing, *State v. Salts*, 288 Kan. 263, 266, 200 P.3d 464 (2009), and Peppers argues that his conviction should be reversed because "the evidence against [him] was hardly overwhelming, and the erroneous instruction very likely had an impact on the jury's verdict."

But a defendant cannot challenge an instruction, even as clearly erroneous under K.S.A. 22-3414(3), when there has been on-the-record agreement to the wording of the instruction at trial. See, *e.g.*, *State v. Angelo*, 287 Kan. 262, 278-79, 197 P.3d 337 (2008). The defendant has invited the error and cannot complain. *State v. Adams*, 292 Kan. 151, 164, 254 P.3d 515 (2011) (citing *State v. Cramer*, 17 Kan. App. 2d 623, 632-33, 841 P.2d 1111 [1992]).

Peppers cannot complain in this case because the district judge explicitly stated that she would not give the instruction if either side objected. After reviewing the instruction, Peppers' counsel stated that counsel had no objection to the giving of the instruction. This on-the-record agreement to the wording of the instruction was invited error, and we need not further analyze Peppers' argument on this issue.

*Prosecutorial Misconduct During Closing Argument*

Peppers' last challenge to his convictions concerns several instances of what he believes to have been prosecutorial misconduct during closing argument.

"[A]n objection is not required for alleged prosecutorial misconduct during opening and closing argument." *State v. Miller*, 293 Kan. 535, 550, 264 P.3d 461 (2011). Claims of prosecutorial misconduct are analyzed under a familiar two-step analysis. *Miller*, 293 Kan. at 550.

"First, the appellate court decides whether the remarks were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, the appellate court must determine whether the improper remarks prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Adams*, 292 Kan. 60, 6667, 253 P.3d 5 (2011); *State v. Huerta-Alvarez*, 291 Kan. 247, 261, 243 P.3d 326 (2010); *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009)." *Miller*, 293 Kan. at 550.

Peppers argues that the State committed prosecutorial misconduct during its closing argument by: (1) commenting on facts not in evidence; (2) endorsing the credibility of Hayes-Osby; (3) attempting to shift the burden of proof to Peppers; and (4) expressing the prosecutor's personal opinion of Peppers' guilt. Peppers argues that the comments by the prosecutor were outside the latitude given a prosecutor in discussing the evidence and constituted plain error entitling him to reversal.

### 1. *Comments on Facts Not in Evidence*

Prosecutors are prohibited from arguing facts not in evidence, but they are given wide latitude during closing argument to argue reasonable inferences based on the evidence presented at trial. *State v. Tahah*, 293 Kan. 267, 277, 262 P. 3d 1045 (2011) (citing *State v. Richmond*, 289 Kan. 419, 440-41, 212 P.3d 165 [2009]; *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 [2000]). Prosecutors also are given a certain amount of leeway when responding to defense counsel statements or arguments. See, *e.g., Miller*, 293 Kan. at 551 (court "may consider whether the prosecutor's remark is . . . made in response to defense counsel's remarks"); *State v. Anthony*, 282 Kan. 201, 212, 145 P.3d 1 (2006) (prosecutor's remarks permissible because "the analogy was responsive to the defense argument regarding the thoroughness of the investigation of this crime").

Peppers argues the prosecutor twice commented inappropriately on facts not in evidence. The first statement was:

"If it was in the Topeka Capital-Journal back in '07, we would have seen a copy of it. That information wasn't out there, Ladies and Gentlemen. What else did the defendant tell Mr. Kelley? Two dudes I jumped on, shot 'em. Two. One dead, one alive. They couldn't get out because of the position they were in. Well, what do you think that meant? I thought they were in some sort of cul-de-sac, like they were in a car and they were pinned in and that's why we shot them up that way. Well, guess what? They were pinned in. They were in a car facing a brick wall. Where would he have gotten that information? Where would he have gotten any of that information? What's the most logical, reasonable source? The person he's in that jail with, the defendant, in Florence, Colorado."

At trial, Kelley testified that Peppers told him about the shooting while they were incarcerated together in Colorado. Kelley testified that he had no connection to the state of Kansas. Specifically, Kelley testified that he did not read Kansas newspapers, watch Kansas television, or watch Kansas news. Kelley said that he knew "a few" people from Kansas while he was incarcerated, but none of them ever mentioned any crime occurring in Topeka. He reaffirmed on cross-examination that the only information he knew about Kansas he got from Peppers. Kelley denied that he could have gotten the information from a newspaper.

Peppers is correct that the State did not show at trial that the information regarding the homicide "wasn't out there" in the Topeka Capital-Journal in 2007. But Kelley did testify extensively that Peppers was the source of his information, not any Kansas news outlet. The prosecutor made the comment during his explanation of the "logical source" of Kelley's information about the crime. Taken in context, the comment can fairly be considered an "argument that includes reasonable inferences based on the evidence adduced at trial." *Tahah*, 293 Kan. at 277. The prosecutor did not exceed the wide latitude afforded him in discussing the evidence.

The second statement about which Peppers objects was:

"Unless you are to believe that somehow there is this conspiracy that law enforcement, the district attorney's office or someone is telling [the State's witnesses], well, that's all well and good but you need to say it was Antwan Peppers, that's what we really need. That would be a terrible thing if law enforcement was doing that. That would be a terrible thing if the district attorney's office did that.

"Is that what happened here? Do you believe that law enforcement and the DA's office took Ms. Stano, Ms. Lewis, Mr. White, and told them say it's Antwan for us. We need that because we really want him. Is that what you truly believe took place in this courtroom over the last nine days? No, that's not what happened."

Before this statement by the prosecutor, Peppers' counsel had argued that the police had "fail[ed] to do their job" and that they did not conduct "a thorough investigation," which resulted in "an innocent person" being charged and tried. Peppers' counsel also had argued extensively that the State's witnesses were not credible. Peppers' counsel had not explicitly argued that there was a law enforcement conspiracy.

We read defense counsel's precipitating argument to suggest incompetence more than malfeasance on the part of police and prosecutors, as well as an unsurprising challenge to obvious Achilles' heels of the State's witnesses. And the prosecutor may have overreacted slightly by denying any nefarious plot to convict Peppers. But the denial was exceptionally brief, actually only a five-word reassurance after setting out a series of questions he could appropriately encourage jurors to ask themselves. In essence, this passage in the prosecutor's argument boiled down to an assertion that multiple largely consistent versions of events, even from less than solid-gold witnesses, should lead to conviction, not to a conspiracy theory. His skepticism countered defense counsel's, and it did not qualify as misconduct.

### 2. *Endorsement of Hayes-Osby's Credibility*

Peppers also argues that the prosecutor impermissibly commented on the credibility of Hayes-Osby.

"Generally, prosecutors cannot offer juries their personal opinions on the credibility of witnesses. *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010). We prohibit the prosecutor from expressing personal opinions on the credibility of a witness because such comments are 'unsworn, unchecked testimony, not commentary on the evidence of the case.' *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000)." *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011).

But mere reference to the terms of a witness' plea agreement does not constitute misconduct. See *State v. Kraus*, 271 Kan. 810, 821-

22, 26 P.3d 636 (2001); *State v. Edwards*, 39 Kan. App. 2d 300, 310-11, 179 P.3d 472, *rev. denied* 286 Kan. 1181 (2008).

Here the prosecutor said:

"You have got to step up, you have got to swear under oath and, yes, you are going to be 15 feet away from that man and you have got to do it. What is it? It is tell the truth. Whatever that is. The only way he gets the benefit of the bargain, the reduction of 75 months[] recommendation, the only way is to speak the truth when he takes the stand. That's it. Whatever the truth was."

In this passage the prosecutor did not impermissibly give his personal opinion of Hayes-Osby's credibility. Rather, the prosecutor referred to the terms of the plea agreement mentioned during the testimony and said twice that the agreement required Hayes-Osby to tell the truth "whatever that was." The prosecutor did not tell the jury what the truth was or characterize Hayes-Osby's degree of success in abiding by the agreement's terms. In addition, we note that, at another point during closing argument, the prosecutor emphasized to the jury: "[Y]ou are the one that judges credibility, not me and most certainly not [Peppers' counsel]. You do and that's why the whole transcript has been admitted for you to consider." Again, we see no misconduct in the prosecutor's discussion of Hayes-Osby's plea agreement.

### 3. *Attempting to Shift the Burden of Proof*

Peppers next argues that the prosecutor impermissibly attempted to shift the burden of proof to the defense.

"Kansas courts deem it 'improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof.' [Citation omitted.] But we grant prosecutors considerable latitude to address the weaknesses of the defense. [Citations omitted.]" *Duong*, 292 Kan. at 832. Moreover, this court "may consider whether the prosecutor's remark is . . . made in response to defense counsel's remarks." *Miller*, 293 Kan. at 551. The prosecutor's comment must be evaluated in context and can be mitigated by jury instructions regarding the burden of proof. *State v. Cosby*, 293 Kan. 121, 137, 262 P.3d 285 (2011). When a prosecutor's comment "constitute[s] only a general question about the absence of evidence to rebut the State's wit-

nesses . . . not an impermissible remark about the defendant's failure to testify or an attempt to shift the burden of proof to the defense," the comment is within the wide latitude afforded to the prosecution. 293 Kan. at 136 (citing *State v. McKinney*, 272 Kan. 331, 346, 33 P.3d 234 [2001], *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 [2006]); see also *Duong*, 292 Kan. at 833 ("[I]n this case, we read the statements at issue as mere comment on the weakness of Duong's defense.").

Here the prosecutor stated:

"Now, like I told you before and I think I have been consistent through the trial all the way through the trial, the people that witnessed this crime, the people we presented for your consideration are who they are. There's no doubt about it. Ms. Lewis was a drug addict. Is she now? I don't know. She was then. She was in the alley buying crack. Ms. Stano, same thing. They are who they are.

"But I think [Peppers' counsel] misses the point. The point is is there any evidence otherwise that tells you something different about what Mr. Hayes told you happened[?] Now these people given who they are could have said something else. They could have said no, it's not this guy. They could have said another name, but they didn't."

This passage in the prosecutor's argument came after Pepper's counsel had urged the jury to tell the State:

"We want better evidence than from people like Terrell Hayes-Osby. We want better evidence than from people like a jailhouse snitch. We want more credible evidence than from people like Latiseia Stano and Stacey Lewis. Tell him in the best way you can, tell him in the best way that our system allows, tell him with pride and tell him with integrity, not guilty."

When read in context, we again see no misconduct in the prosecutor's comment. The prosecutor needed to acknowledge weaknesses in his own case, which he did, and he did not call upon Peppers to present specific evidence, such as his own testimony, or to contradict the evidence presented by the State. Rather, the prosecutor pointed out that the State's witnesses, such as they were, said nothing to contradict Hayes-Osby version of events. See *Cosby*, 293 Kan. at 136. We also note that the jury was correctly instructed: "[T]he State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty." We conclude that the prosecutor permissibly "argue[d] inferences

based on the balance or lack of evidence." 293 Kan. at 136 (citing *McKinney*, 272 Kan. at 346).

### 4. *Expressions of Personal Opinion About Peppers' Guilt*

Peppers argues that the prosecutor committed misconduct twice by giving a personal opinion about Peppers' guilt.

"Prosecutors must not state a personal opinion regarding the ultimate guilt or innocence of the defendant. The reason for prohibiting prosecutors from commenting on their opinion of the defendant's guilt is that such expressions of personal opinion are a form of unsworn, unchecked testimony, not commentary on the evidence of the case." *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006).

See also *State v. Hall*, 292 Kan. 841, 852, 257 P.3d 272 (2011); *State v. Gonzalez*, 290 Kan. 747, 766, 234 P.3d 1 (2010); *State v. Miller*, 284 Kan. 682, 717, 163 P.3d 267 (2007). But this court has allowed a "directional" statement by a prosecutor that can "best be characterized" as serving "as an opening for the prosecutor's upcoming summation of the evidence." *State v. Mann*, 274 Kan. 670, 689, 56 P.3d 212 (2002). This court also has stated that a "prosecutor's comments asking the jury not to let the defendant get away with the crime is in most instances permissible comment." *State v. Finley*, 273 Kan. 237, 244-45, 42 P.3d 723 (2002) (citing *State v. Cravatt*, 267 Kan. 314, 332, 979 P.2d 679 [1999]).

The first statement Peppers challenges as an expression of personal opinion about guilt was:

"Now, when [Peppers' counsel] finishes up, I'm going to have an opportunity to come talk to you again and when I do, I'm going to ask that you find this defendant, Antwan Peppers, guilty of murder in the first degree and guilty of attempted murder in the first degree. Why? Because he did it."

Second, Peppers objects to the prosecutor's statement during the second segment of his closing argument:

"When you come back in after your deliberation after reviewing the evidence, you need to come in, you need to look at the defendant, and you need to tell him he's guilty and you need to look him in the eye and say you are guilty of murder and you are guilty of attempted murder because he is."

It is permissible for a prosecutor to argue that the evidence demonstrates a defendant's guilt. For example, in *Mann*, 274 Kan. at

688-89, we approved of a prosecutor's statement near the beginning of closing argument that "[t]he [S]tate believes that [the victim] was killed with premeditation intentionally, first degree, and this is why," which led into discussion of the evidence pointing to guilt. *State v. Bennington*, 293 Kan. 503, 530-31, 264 P.3d 440 (2011) (prosecutor's statement—"That's what he did"—did not exceed wide latitude afforded prosecutor—when the prosecutor "relating the facts" to elements of crime). It is necessary, however, for a prosecutor to say something akin to "the evidence shows defendant's guilt" in order to make a statement merely directional and not an expression of the prosecutor's personal opinion.

The prosecutor failed to include any directional language in this case, and we, therefore, hold that the two comments challenged by Peppers strayed into impermissible expressions of prosecutor's personal opinion on Peppers' guilt. This was misconduct and must be evaluated for plain error necessitating reversal.

Under the second step of the prosecutorial misconduct analysis, this court must consider whether the remarks prejudiced the jury against Peppers and denied him of a fair trial. Three questions guide our analysis: Was the misconduct gross and flagrant? Does the misconduct show ill will? Was there a reasonable possibility that the misconduct affected the verdict? See *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011).

"In assessing whether gross and flagrant conduct has occurred, appellate courts should look to whether the prosecutor ' "repeated or emphasized the misconduct." ' *State v. Simmons*, 292 Kan. 406, 417-18, 254 P.3d 97 (2011) (quoting *State v. Madkins*, 42 Kan. App. 2d 955, 961, 219 P.3d 831 [2009]). Similarly, a prosecutor's ill will is usually 'reflected through deliberate and repeated misconduct or indifference to a court's rulings.' *Madkins*, 42 Kan. App. 2d 955, 961, 219 P.3d 831 (citing *State v. Bunyard*, 281 Kan. 392, 407, 133 P.3d 14 [2006])." *Chanthaseng*, 293 Kan. at 148-49.

"Gross and flagrant" conduct may also be demonstrated by "an accumulation of comments that would not individually be cause for reversal." *Miller*, 284 Kan. at 719. Ill will may be found "when the prosecutor's comments were 'intentional and not done in good faith.' [Citation omitted.]" 284 Kan. at 719.

Peppers argues that the prosecutor's misconduct in this case was repeated and that it violated the district judge's pretrial order in limine. In Peppers' view, this demonstrates that the improper comments by the prosecuting attorney were both gross and flagrant and the product of ill will.

We disagree with these answers to the first two questions. The two comments were very brief and virtually identical. When seen as the minor component of argument that they were, they do not evidence indifference to the district judge's limine ruling. This is not a situation in which a prosecutor persisted in bad behavior after being warned or admonished contemporaneously by the trial judge. See, *e.g.*, *Inkelaar*, 293 Kan. at 430 (quoting *Madkins*, 42 Kan. App. 2d at 961) ("a prosecutor's ill will is usually 'reflected through deliberate and repeated misconduct or indifference to a court's rulings' ").

The remaining question is whether the State has demonstrated that "there is no reasonable possibility that the error affected [the defendant's] substantial rights, *i.e.*, that there is no reasonable possibility the error affected the verdict." *Chanthaseng*, 293 Kan. at 149. Peppers argues that the evidence was not direct and overwhelming because "the State had no physical evidence that linked Mr. Peppers to the crime, and the witnesses who testified against Mr. Peppers were hardly credible."

Although it is true that there was no physical evidence against Peppers, there was ample direct and circumstantial evidence in the form of eyewitness accounts that included multiple identifications and a detailed explanation of his possible motive. There was corroboration of Hayes-Osby's description of telephone calls and Kelley's account of Peppers' self-incrimination. We do not re-evaluate credibility a jury has already determined. See *State v. Ward*, 292 Kan. 541, 543, Syl. ¶ 12, 256 P.3d 801 (2011).

The relative weakness of Peppers' allegations of prosecutorial misconduct, combined with the cumulative magnitude of the evidence presented against him at trial, persuades us that there is no reasonable possibility the prosecutor's expressions of personal opinion about Peppers' guilt affected the jury's verdict. *Chanthaseng*, 293 Kan. at 149-50.

## Conclusion

None of the arguments advanced by defendant Antwan T. Peppers entitles him to reversal of his convictions for first-degree premeditated murder or for attempted first-degree murder or to vacation of his consecutive hard 50 life sentence and 272-month term of imprisonment. The judgment of the district court is therefore affirmed.