NOT DESIGNATED FOR PUBLICATION

No. 118,772

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL LEE YATES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed November 21, 2018. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Andrew R. Davidson*, senior assistant district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., PIERRON and LEBEN, JJ.

PER CURIAM: A jury convicted Michael Lee Yates of battery of a state correctional officer. The district court sentenced him to 136 months in the Kansas Department of Corrections (KDOC). Yates appeals.

Sarah Monson was a correctional officer (CO) at the Hutchinson Correctional Facility (HCF). On June 23, 2015, she and CO Colin Getman were working in the yard for inmates housed in maximum security. While monitoring inmates, they stood on the podium in the center of the yard, allowing them to observe all directions. Inmates have

1

access to phones and a JPay kiosk in the yard. The JPay allows inmates to check email and their inmate accounts. Inmates who have violated rules wear yellow jumpsuits to show they are on restriction and are not allowed access to the phone or JPay.

Yates was wearing a yellow jumpsuit that day. CO Getman observed Yates using the JPay and informed CO Monson that he was going to tell Yates to get off the machine. However, Monson volunteered to do so. Getman remained on the podium to watch the interaction. When CO Monson approached Yates, she raised her voice over the volume of the surrounding noise and stated, "Sir, you're not supposed to be on the JPay machine; I'm going to have to ask you to stop." Yates did not comply and insisted he could use the machine. CO Monson pointed to CO Getman and told Yates they could go talk to him to clear up the situation. Yates became visibly angry, began cussing at her, and called her a "stupid bitch." She then ordered Yates to give her his ID because she was going to write him up. Instead of complying, he continued calling her names until another inmate persuaded him to walk away. He cussed and yelled so loudly that CO Getman, who was 60-70 yards away, heard him. Because he refused to provide his ID, CO Monson tried to look at it so she could write him up later.

When it appeared the inmates were walking away, CO Monson turned to look around the yard. When she turned back, Yates punched her under the chin. She fell backward into a brick wall and fell to the ground. While she was on the ground, Yates began stomping on her repeatedly. CO Getman ran to assist CO Monson but before he reached her, Yates stopped kicking her and started walking off. When CO Getman reached Monson, he had his pepper spray in hand. Yates reported that he squared up to CO Getman but did not fight him because of the pepper spray. Another inmate told CO Getman to "hold on" and then told Yates to get on the ground. Yates turned around, put his hands behind his back, and got on his stomach. As CO Getman was handcuffing him, officers from the special security team (SST) arrived.

SST Corporal Devin Carpenter and Officer Sean McDaniel escorted Yates to segregation. Corporal Carpenter testified Yates was agitated and did not want to follow directives. He was not happy about going to segregation. Corporal Carpenter stated: "[Yates] kept on repeating 'I'm, I'm a disciple of God' and kept repeating over and over and over. And then he looked over his left shoulder and looked at me and said he was going to kill me, too." Officer McDaniel testified Yates also told the officers that CO Monson had "hate in her eyes and hate in her blood and that she deserved what she got."

After the incident, CO Monson received treatment in the emergency room. Her injuries included three bulging discs, nerve impingement, and all the muscles on the left side of her body had been pulled. She received physical therapy and was out of work for 11 months.

On June 24, 2015, KDOC Special Agent Merritt interviewed Yates. Sgt. Mitchell and Special Agent Markus were present during the interview. Yates confirmed that he understood his Miranda rights. He agreed to speak with the agents but said he would not get into the specifics of the incident. He explained that CO Monson approached him yelling and treating him as if he was in prison. When he tried closing down his messages and logging off the JPay, Monson yelled at him to get off immediately. He admitted he called her a "bitch" and that he "responded to hate with hate." When he refused to give her his ID, she tried calling for assistance on her radio. Her attempt to call for assistance triggered him, causing him to "spaz" out. Yates perceived CO Monson as abusing her authority over him by yelling at him. Although he had provided no details about the physical altercation, Yates told the agents that he "did something that was really very wrong" and that he accepted full responsibility and the consequences of the incident. While he insisted that he did not want to confess on tape, he confirmed that he "could have really messed that woman up" if he had wanted to.

3

During the interview, Yates stated he had been "out the hole for 4 days" and he "went to the hole for something similar; threatening intimidation" with a male guard. He stated he had come from Winfield [Correctional Facility] for "something similar to what happened, but it didn't go this far." He further explained: "It was, it was a guard and I, you know, I reacted toward it but I didn't, you know, it wasn't no altercation"

Yates eventually admitted he had hit CO Monson a couple of times and kicked her in a stomping manner twice. He said he squared up with CO Getman but "I was just thinking I can't go against him" because CO Getman had his pepper spray. Although Yates blamed CO Monson for the way she approached him and abused her authority, he agreed, "the bottom line is I was wrong for what I did, clearly."

The State charged Yates with one count of battery against a state correctional officer. He filed a pro se motion to dismiss, essentially arguing that criminal prosecution constituted double jeopardy after he pled guilty to the charge in his disciplinary hearing in HCF and had paid his consequences. At the preliminary hearing, the district court dismissed his motion as without merit. Yates' pro se motion was the only pretrial motion submitted. Before the pretrial conference on March 3, 2017, the State submitted a transcript of Yates' interview to defense counsel. Yates did not object to the content of the interview.

During trial, the State presented the facts as provided above. The State played both the video recording of the incident and the audio recording of Yates' interview with the agents. Because the State also provided the transcript of the interview, the district court informed the jury that the recording was evidence, but the transcript was merely to assist as it listened to the recording. Yates did not object to the State playing the interview recording in court. After the audio recording played, the court admonished the jurors, saying:

"Ladies and gentlemen of the jury, I want you to listen to me very carefully. I have not heard the tape or seen the transcript prior to today. There were statements made on that transcript that indicate a possible incident had occurred earlier at Winfield. You will totally disregard that portion of the tape. That has nothing to do with this case. We are deciding the case solely on the facts occurring here at HCF. That should not have been presented to you. Do not consider anything in, that's contained on the tape, any statements made about an incident occurring prior in Winfield involving another officer. "Do you all understand that? That is not relevant to this proceeding. Thank you."

After the State rested its case, Yates moved for a directed verdict, claiming the State had failed to meet its burden of proof. The district court denied the motion. Yates waived his right to testify and declined to present any other testimony. In his closing arguments, Yates contested that he knowingly caused bodily harm. He described CO Monson as disrespectful and yelling at him though he thought he could use the JPay. Yates focused on his statement to officers that CO Monson had hate in her eyes and hate in her blood. He pointed out that the definition of bodily harm required the physical force to be "intentional, hostile, and aggressive" and contended that he could not have intentionally done so because he "spazzed out." He focused on how quickly everything happened and that he "just kind of lost it." Yates used the same rationale in arguing that he could not have knowingly committed the battery. He asserted that he was unaware of his conduct at the time because he "kind of lost his head."

After approximately 10 minutes of deliberation, the jury found Yates guilty of battery on a state correctional officer. The district court sentenced him to the aggravated sentence of 136 months in KDOC custody with 24 months of postrelease supervision. Yates appeals.

Yates contends the district court committed reversible error by introducing evidence of three incidents of other crimes or bad acts. First, during Corporal Carpenter's direct examination, the State asked what Yates had said when Carpenter escorted him to

5

segregation. Carpenter testified Yates had "looked over his shoulder and looked at me and said he was going to kill me, too." Second, during the interview, Yates told the agents that he had recently gone to the hole for a similar incident with a male guard and described the incident as "threatening intimidation." Third, during the interview, Yates discussed an incident at Winfield, saying he was sent to HCF from Winfield because of a similar situation but said that incident "didn't go this far."

Yates did not object to any of the statements and the district court admonished the jurors only as to the statements about the incident at Winfield. Because he does not contest the effectiveness of the admonition, those statements are not included in the analysis. That said, Yates contends that by telling the jurors to decide the case "solely on the facts occurring here at HCF," the court improperly encouraged them to consider the prior incident of "threatening intimidation" and the threat to Corporal Carpenter.

*Standard of Review*

When admitting K.S.A. 2017 Supp. 60-455 evidence, a district court must first determine whether the evidence in question was relevant in proving a disputed material fact. *State v. Butler*, 307 Kan. 831, 859-60, 416 P.3d 116 (2018) (citing *State v. Reid*, 286 Kan. 494, 503, 186 P.3d 713 [2008]). Evidence is relevant if it is both material and probative. "Material evidence tends to establish a fact that is at issue and is significant under the substantive law of the case. Probative evidence requires only a logical connection between the asserted fact and the inference it is intended to establish." *State v. Robinson*, 306 Kan. 431, 436, 394 P.3d 868 (2017). Then the court must determine whether the probative value of the evidence outweighed the potential for undue prejudice. *Butler*, 307 Kan. at 859. Last, the court must give a limiting instruction informing the jury of the specific purpose of the admission of that evidence. 307 Kan. at 859-60.

6

This court conducts a de novo review of the materiality of evidence. *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010). An appellate court reviews the probative value of the evidence under an abuse of discretion standard. Evidence is probative if it tends to prove any material fact. *State v. Peppers*, 294 Kan. 377, 387, 276 P.3d 148 (2012).

In this case, the State did not move to admit 60-455 evidence, nor did Yates object to the State's use of the evidence at trial. Consequently, the district court could not engage in the proper K.S.A. 2017 Supp. 60-455 analysis. Absent such analysis, the admission of such evidence is not inevitably so prejudicial as to warrant automatic reversal. *State v. Gunby*, 282 Kan. 39, 57, 144 P.3d 647 (2006) *modified on other grounds by State v. Campbell*, 308 Kan. 763, 773, 423 P.3d 539 (2018).

*Preservation*

For an appellate court to review a district court's decision on admissibility of evidence, the party claiming error must have objected to the evidence when it was admitted. K.S.A. 60-404. This legislative mandate "dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). In *King*, the Kansas Supreme Court wrote,

> "Although our past decisions may have relaxed the objection requirement in the evidentiary context, this practice not only has led to confusion as to the standards that should be applied on appeal, but also has de-emphasized the role of counsel at trial and has impaired the gate-keeping function of district courts in this state. More importantly, this practice of reviewing evidentiary questions when no objection has been lodged runs contrary to the legislature's clearly stated intent in K.S.A. 60-404. [Citation omitted]." 288 Kan. at 349.

7

Therefore the issue is not properly before us. But, since there is a possibility of review, we will address the underlying issues.

Even if Yates had objected to the admission of his statement and the court admitted it anyway, the admission of this evidence would not warrant a reversal if doing so was harmless. See *State v. Torres*, 294 Kan. 135, 143, 273 P.3d 729 (2012). We must determine whether the error affected the outcome of the trial. 294 Kan. at 143-44.

Yates contends the error was reversible because "so much of the incriminating evidence was evidence of other crimes or bad acts" making the trial a "referendum on other misconduct committed by Yates." He conceded to most of the facts of the case, only contesting that the physical force was intentional and that he acted knowingly. The overwhelming evidence suggests that any possible K.S.A. 2017 Supp. 60-455 errors would not have affected the outcome of the trial. Even if the court erroneously admitted those statements, the remainder of Corporal Carpenter's testimony and the interview were admissible. Carpenter testified that Yates said CO Monson "got what she deserved." CO McDaniel testified that Yates said CO Monson "had hate in her eyes and hate in her blood and that she deserved what she got." In the interview, Yates stated:

> "I responded quickly; I responded to hate with hate and I logged out and she was, like, okay, now I'm going to need your card. And not I'm going to need your ID and my anger, you know, got to me.
>
> . . . .
>
> ". . . . And I was wrong what I did to that woman. I was wrong what happened.
>
> . . . .
>
> "Because she was using her authority. I think, you know, the main thing that happened is she was abusing her authority from a jump for yelling at me.
>
> . . . .
>
> ". . . . I responded to hate with hate. And then that's what happened. And I think something that was really very wrong, you know what I'm saying, now that I think about her family and everybody.

. . . .

"But, you know, everything that happened, it was what it was, you know, and I accept full responsibility of what, of, you know, the consequences or whatever have to happen.

. . . .

". . . I responded to her and I could have really messed the woman up if I wanted to.

. . . .

"So I just hit her a couple of times and then I went to the guy and he pulled out the mace on me.

. . . .

". . . . I kicked her, like, two times I believe.

. . . .

". . . I was just thinking I can't go against [CO Getman]; he got something.

. . . .

". . . . But the, the bottom line is I was wrong for what I did, clearly."

He also stated he stopped battering CO Monson "Cause I was like, you know, this is a woman, and, you know what I'm saying, I just, when you get angry you want to get it out."

Yates' statements and behavior show that he intended to batter CO Monson and thought clearly in the midst of the battery. He became angry upon contact with CO Monson because he perceived her as abusing her authority by yelling at him. He perceived her as hateful and so responded with hateful actions. While escalating the situation by yelling and cussing, he logged out of his account before escalating to physical force. CO Monson's attempt to call for assistance triggered him to escalate the situation further. He appeared to start walking away before surprising CO Monson with the attack. While kicking her, he made the conscious decision to stop because CO Monson was a woman. He also made the conscious decision to stop the incident altogether rather than physically attacking CO Getman because he had mace in his hand.

9

At no point did Yates contend that he was not in control of his actions. He referenced acting "in the flesh" rather than acting in the spirit. That is merely a biblical reference to sinning as he had also discussed his recent disobedience to God.

Therefore, even if we determined Yates properly addressed the issue on appeal, the evidence overwhelmingly supports the guilty conviction. Yates confessed to battering CO Monson and made numerous statements establishing his awareness of his actions as he committed the battery. Even if the district court had admitted this evidence over Yates' objection, any error would have been harmless.

Affirmed.