NOT DESIGNATED FOR PUBLICATION

No. 117,993

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BIRGILIO C. CASTRO-MONCADA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Opinion filed March 22, 2019. Affirmed in part and vacated in part.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., BUSER and SCHROEDER, JJ.

BUSER, J.: This is an appeal by Birgilio C. Castro-Moncada of his convictions and sentence for the rape of A.F., a child under 14 years of age, and aggravated indecent liberties with N.P., a child under 14 years of age. Castro-Moncada raises four issues: (1) the prosecutor erred during closing argument; (2) the district court erred in allowing a witness to testify in violation of a sequestration order; (3) the district court erred in failing to sever the charges; and (4) the district court erred in imposing lifetime postrelease supervision for the off-grid crimes.

1

Upon our review of the parties' briefs and record on appeal, we find no reversible error with regard to the conduct of the jury trial. Accordingly, the convictions are affirmed. We find error, however, in the district court's imposition of lifetime postrelease supervision. As a result, we vacate that portion of his sentence.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2015, A.F. and N.P., who are cousins, reported that their step-grandfather, Castro-Moncada, had engaged in sexual relations with them. A.F. and N.P. were both born in 2002. At the time, Castro-Moncada was married to C.C. C.C. had three adult daughters, D.C., J.P., and R.C. D.C. was the mother of A.F., and J.P. was the mother of N.P.

In June 2015, R.C. made a post on Facebook stating, in effect, that she had been a victim of sexual abuse and she did not think it was right for child sex abusers to live normal lives after destroying their victims' lives. Many family members responded to R.C.'s post. Her niece, A.F., sent several posts. The first one stated: "[Inspiration]. Thanks aunt [R.C.]. I love you." A.F.'s second post stated: "You don't understand how that post changed my life." R.C. responded to A.F. by informing her that she was willing to talk with her if needed. But upon learning of the Facebook exchange, D.C. cautioned her daughter: "Maybe you shouldn't say things like that, people are going to think someone's doing bad things to you."

A.F. began crying and told her mother that Castro-Moncada was having sexual relations with her. In response, D.C. called her sister, R.C., and reported that A.F. said that Castro-Moncada had been sexually molesting her since she was six years of age. R.C. went over to D.C.'s residence and spoke privately with A.F. A.F. told her aunt that Castro-Moncada began fondling her when she was six years old, and the sexual relations had progressed until there was intercourse. The police were notified and A.F. was taken

2

to a local hospital for a forensic examination. At that location, A.F. and D.C. were individually interviewed by Officer Raymond Marsh.

A.F. testified at trial. At that time she was in the eighth grade. A.F. testified that she had known Castro-Moncada for eight to nine years. When she was younger she would go over to the residence of her grandmother and Castro-Moncada and sometimes stay overnight. On several occasions when she stayed overnight and her grandmother was asleep, she was awakened by Castro-Moncada touching her with his hand on her vagina.

When A.F. was 10 or 11, Castro-Moncada began penetrating her during sexual intercourse. A.F. related that she would tell Castro-Moncada to get off of her and that he would stop if "I told him I hear my mom's car or he was done." For some period of time these sexual assaults occurred every weekend. The last incident occurred on the weekend before A.F. disclosed the sexual assaults to her mother. According to A.F., on this occasion, "[Castro-Moncada] grabbed me by my arm after my grandma went to sleep and he took me into the kitchen. . . . He told me to get on the floor. . . . He told me to take off my shorts." Castro-Moncada then had sexual intercourse with A.F.

Sometimes Castro-Moncada referred to A.F. as his girlfriend. According to A.F. she did not disclose the sexual assaults earlier "[b]ecause [Castro-Moncada] told me not to tell anyone so I just kind of thought I shouldn't, and I felt like if I did it would have been my fault that he would have got in trouble."

A.F. testified that sometimes during the sexual assaults Castro-Moncada would put a clear solution on his hand or penis that came from a small clear bottle with a black cap labeled "H2O." The bottle was kept in a black cloth tool bag that was on a metal shelf next to a recliner or on the top bathroom bookshelf. At trial A.F. identified a picture of the bottle. As depicted in the photograph, the bottle was transparent with a clear liquid and a black cap. It was labeled "JOH2O, and indicated it was a "water based" and "silky

3

smooth 'silicone feel'" product. The directions stated: "Apply a small amount of JO Personal Lubricant to genital areas."

A.F. testified that on two or three occasions while at her grandmother's home, Castro-Moncada would have A.F. sit on him while they watched a DVD that was labeled, "Mexicana." This DVD was kept in the bookshelf by the kitchen. According to A.F., this DVD depicted men and women having sexual relations. A.F. identified a picture of the DVD at trial. The label of the DVD contained the word "Mexican" and appeared to contain subject matter of individuals having sexual relations.

A.F. was interviewed by Ann Goodall, a forensic interviewer with the Department for Children and Families (DCF), on June 19, 2015. At that time A.F. was 12 years old. This interview was admitted in evidence at trial. During the interview, A.F. said the sexual abuse began when she was six years old and Castro-Moncada touched her chest under her clothing. A few months prior to her disclosure, A.F. was asleep on a Saturday morning when Castro-Moncada came over to her home. A.F.'s mother left and Castro-Moncada went to A.F.'s room and started touching her chest. Castro-Moncada touched A.F. over her underwear covering her private parts. His hand also went inside her underwear. A.F. also told Goodall of another occasion, after a cookout, when Castro-Moncada was drunk, and he took A.F. in the kitchen and had sexual relations with her.

While A.F. was being examined at the hospital, N.P. told her that Castro-Moncada had been touching her in the living room of their grandmother's home. About a year earlier, N.P. had asked A.F. if Castro-Moncada had ever touched her like he had N.P. According to A.F., at that time she denied any sexual contact because "I didn't want to tell her so that she would tell people."

After the hospital conversation, N.P. told her mother of an incident about a year earlier while she was playing outside. N.P. advised that while playing with a dog, Castro-

4

Moncada "ran his hand up her [crotch] and that she had moved and that it was over the clothes." At trial, N.P. recalled that after the Facebook post her mother asked her if Castro-Moncada had done anything to her. N.P. testified that she told her mother that while she was seated on the couch at her grandmother's home that Castro-Moncada had touched her on her vagina by going up and down with his hand.

N.P. testified at trial. On one occasion, she related that while her grandmother was asleep, she was sitting on the couch in her grandparents' living room when Castro-Moncada moved his hand up and down her vagina. Castro-Moncada then went to the bathroom for a long time and went to bed.

N.P. was also interviewed by Goodall on June 19, 2015. This interview was admitted in evidence at trial. During the interview, N.P. related an incident when she was playing outside with a dog and Castro-Moncada touched her over her clothes with his fingers on her vagina.

On June 23, 2015, Detective Jeremy Berg went to the residence of C.C. and Castro-Moncada to speak with her, photograph the home, and collect evidence. C.C. was aware of the pornographic DVD, and it was recovered from the home. While the detective was taking photographs he heard C.C. yell, "I found it or I got it." She then gave Detective Berg the bottle of JOH2O lubrication that she had found in a small plastic bin with pullout drawers in the spare bedroom. Detective Berg described C.C.'s demeanor at the time of the discovery, "She was visibly moved and crying and angry or she—she was upset by it." Detective Berg photographed and recovered the bottle and also photographed a black bag containing tools similar to one that A.F. had described.

C.C. testified on direct examination, "I saw what the detective had described to me and I picked it up and when I looked at it and saw what it was I just lost it because I knew—I just knew." According to C.C., she had never seen Castro-Moncada use the

5

lubrication and she and Castro-Moncada had never used it. In fact, C.C. testified that she had never seen the bottle before she discovered it when Detective Berg came to search her home.

According to an affidavit in support of a request for an arrest warrant, Castro-Moncada was interviewed by Detective Berg on June 22, 2015. This affidavit stated: "I interviewed Birgilio at the LEC. Post Miranda he denied sexually touching [A.F.] or [N.P.]." The affidavit and criminal complaint were filed on June 24, 2015, and an arrest warrant was issued the same day. Castro-Moncada was arrested on June 26, 2015.

At the time of trial, Castro-Moncada was charged in an amended complaint with four counts of rape of A.F., a child under 14 years of age, and one count of aggravated indecent liberties with N.P., a child under 14 years of age.

In addition to the above-referenced trial testimony by the State's witnesses, Castro-Moncada testified in his own defense. At the outset, Castro-Moncada stated he was born on August 18, 1961, and had been married to C.C. for about 10 years. Castro-Moncada testified that he got along well with A.F. and N.P., and he denied engaging in any sexual activity with either of the girls.

According to Castro-Moncada, however, C.C.'s daughters, over time, hated him and they wanted to make sure that he did not get any of C.C.'s money upon her death. In particular, he related two occasions, one in 2013 and another in 2015 that he had a dispute with D.C. In 2013, D.C. was angry with Castro-Moncada because C.C. indicated that she was going to leave him $20,000 to $25,000 upon her death. According to Castro-Moncada, D.C. felt the money belonged to her. Additionally, Castro-Moncada related an incident in 2015 wherein D.C. came to his home and said, "Well, [C.C.'s] going to die and I'm going to return here to burn [the house] with you inside."

6

Castro-Moncada testified that he once observed A.F. watching pornography on the computer. At the time, he was outside smoking a cigarette and when he looked towards the window, he could see through an opening in the curtain that she was watching it.

Castro-Moncada also testified that he used the bottle of JOH2O lubrication to help relieve his heat rash. Castro-Moncada explained that six or seven years ago, an acquaintance who had moved from Iowa, and whose name he could not recall, recommended the "medication." Castro-Moncada testified that he kept the bottle of lubricant in his tool bag since he took it to work because "on my lunchtime I would go to the bathroom and apply it. When I used to get home I used to take it out and I would shower and I would apply it." According to Castro-Moncada, he applied the lubricant every night.

As to the pornographic DVD, Castro-Moncada stated that another friend, who later moved to Liberal, had given him some CDs as a gift with the DVD included, but he put it on a shelf and never touched it. Additionally, Castro-Moncada testified that he had spoken with the police about the accusations made by A.F. and N.P. and denied them.

On cross-examination, the State asked Castro-Moncada if he ever told the police anything about his two conversations with D.C. regarding the money dispute or if he if told them about seeing A.F. watch pornography on the computer. Castro-Moncada responded that he had not told anyone about these matters until his trial testimony. On redirect examination, Castro-Moncada testified that he did not recall the police ever asking him if he watched pornographic DVDs with either A.F. or N.P.

C.C. testified as a rebuttal witness. She reiterated and expanded on her direct testimony. She repeated that she had never seen Castro-Moncada use JOH20 on his heat rash; however, he occasionally used corn starch. According to C.C., she never found used bottles of the lubrication around the home.

7

C.C. testified that given the placement of the window and curtains covering it, she did believe that Castro-Moncada could have seen inside the house and observed the computer screen where he claimed to have observed A.F. watching pornography. She routinely checked the computer's history, and she never saw any indication that pornography was viewed on the computer.

With regard to Castro-Moncada's testimony that he had two angry conversations with D.C., C.C. only recalled that in 2015 Castro-Moncada told her:

> "[H]e had a conversation with me about—while I was in the hospital [D.C.] . . . coming over to the house and telling him that if anything happened to me that she would make sure that he wouldn't get anything. He never—he didn't say she said anything about the house. And when he told me that I told him not to worry about it because it's not up to [D.C.] who gets—it's in my life beneficiary. It's up to me . . . but that was it, there was nothing about the house."

At the conclusion of the trial evidence, upon motion of the State, the district court dismissed three counts of rape involving A.F. The jury found Castro-Moncada guilty on the remaining two counts—one count of rape of A.F., a child under 14 years of age in violation of K.S.A. 21-3502(a)(2), and one count of aggravated indecent liberties with N.P., a child under 14 years of age in violation of K.S.A. 2014 Supp. 21-5506(b).

The district court sentenced Castro-Moncada to two off-grid life sentences to be served consecutively with no eligibility for parole for 50 years. The district court also imposed a sentence of lifetime postrelease supervision. Castro-Moncada filed a timely notice of appeal.

8

For his first issue on appeal, Castro-Moncada makes two complaints. First, he argues that the prosecutor's closing argument was outside the wide latitude afforded to prosecutors because the State improperly commented on his "lack of explanatory statement to police." Second, Castro-Moncada claims the prosecutor's arguments improperly attempted to shift the burden of proof. We will address these two claims separately.

As detailed in the Factual and Procedural Background, Castro-Moncada testified on his own behalf. Relevant to this first issue, Castro-Moncada testified that he had been interviewed by Detective Berg for about 10 minutes on June 22, 2015. Castro-Moncada agreed to answer the detective's questions and denied the accusations of sexually assaulting A.F. and N.P., stating that the accusations were a "surprise" to him.

During cross-examination at trial, the prosecutor asked Castro-Moncada several questions about the June 22, 2015, interview he had with Detective Berg. In particular, the prosecutor established that while Castro-Moncada denied the allegations of sexual assault, he had not told the detective about the two angry conversations he had with D.C. and that he had observed A.F. watching pornography on a computer at his residence. The prosecutor also established that Castro-Moncada had not told anyone about these matters which he testified about at trial. Of note, defense counsel did not state a contemporaneous objection to the prosecutor's questions.

During the State's rebuttal closing argument, the prosecutor made the following arguments. In particular, Castro-Moncada objects to the arguments which are italicized below:

9

"Let's talk about the Defendant's testimony. [Castro-Moncada] doesn't have the burden in this case but once he testifies you can evaluate his testimony like anyone else. His testimony didn't add up. What he said on the stand was the first time any of us had heard it. He didn't reach out to his wife. *He didn't reach out to the police giving this explanation about what happened*.

"No, he was able to look at the reports; listen to all the testimony and come up with something he thought was a plausible explanation for why that lube was there at the house. The precise lube, specifically described by [A.F.] what he'd used on her.

"He used it for a heat rash. [C.C.] had been married to him for 11 years. [Castro-Moncada] said he'd known about the use of this lube for six to seven years. She never saw an empty bottle with lube in the house. Never saw him use it. He used cornstarch on his heat rash.

"And the DVD, first [Castro-Moncada] said he'd never seen it, he didn't know where it came from. Then when I questioned him on cross he said: Oh, yeah, that's mine but I didn't watch it.

"*A defendant has the ability to subpoena anyone he wants to come and testify*.
. . . .
"*Conveniently enough anything that would corroborate* [*Castro-Moncada's*] *stories about the DVD and the lubrication was not there. No names, no contact information. Conveniently they were all out of state, in Iowa or unreachable. That doesn't add up, ladies and gentlemen.*" (Emphases added.)

Defense counsel did not state a contemporaneous objection to any of the prosecutor's arguments. Moreover, this chain of prosecutorial misconduct was not raised in Castro-Moncada's motion for new trial.

Our standard of review provides a two-step process in evaluating prosecutorial error. First, the appellate court must determine whether an error occurred in which the court "must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. King*, 308 Kan. 16, Syl. ¶ 3, 417 P.3d 1073 (2018).

10

If the appellate court finds error, the State must then demonstrate "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 308 Kan. at 30.

*Claimed* Doyle *Violation*

Castro-Moncada does not claim error in the prosecutor's questions regarding Castro-Moncada's failure to disclose and explain certain evidence during his interview with Detective Berg. As a result, we will not consider the propriety of the prosecutor's cross-examination questions. Castro-Moncada invokes *Doyle* in the context of prosecutorial error regarding the prosecutor's closing argument about Castro-Moncada's failure to disclose certain explanatory information to the police.

As summarized by the Kansas Supreme Court:

"Under *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *State v. Hernandez*, 284 Kan. 74, Syl. ¶ 3, 159 P.3d 950 (2007).

Of particular relevance to this appeal, Kansas law provides:

"Appellate courts do not require a contemporaneous objection to preserve questions of prosecutorial misconduct for comments made during a prosecutor's voir dire, opening statement, or closing argument. Instead, such allegations of prosecutorial misconduct are subject to a two-step analysis, which inquires (1) whether the prosecutor's conduct was outside the wide latitude allowed prosecutors when arguing cases; and (2) if so, whether that conduct deprived the defendant of a fair trial." *State v. King*, 288 Kan. 333, Syl. ¶ 8, 204 P.3d 585 (2009).

11

Despite the fact that Castro-Moncada did not contemporaneously object to the prosecutor's closing argument, we will consider the *Doyle* issue on appeal.

For the first time on appeal, Castro-Moncada makes the argument:

"In this case, [Castro-Moncada] was advised of his right to remain silent, but spoke to police and maintained his innocence of the charged acts. . . . [Castro-Moncada's] full statements to police were not introduced at trial. However, when discussing [Castro-Moncada's] testimony during rebuttal closing argument, the prosecutor explicitly pointed out that the statements he made at trial had never before been made to anyone else. The prosecutor also specifically noted [Castro-Moncada] had failed to reach out to either [C.C.] or the police with the explanation that he had provided when he testified at trial. The implication of this argument is that, if [Castro-Moncada] were telling the truth when he had testified, he would have provided his explanation to the police at some point *after he was charged* and not waited to disclose his version for the first time at trial." (Emphasis added.)

We question Castro-Moncada's explanation of the prosecutor's one-sentence argument. Preliminarily, we observe that if Castro-Moncada had objected to the argument at trial the parties and our court would not be burdened with speculating about what the prosecutor meant and what, if anything, at trial Castro-Moncada found objectionable about the comment.

Nevertheless, for the first time on appeal, Castro-Moncada asserts an "*implication of this argument*" is that the prosecutor was referring to Castro-Moncada's failure to provide an explanation to the police "at some point *after he was charged*." (Emphasis added.) But the prosecutor's argument did not refer to or suggest that it referred to Castro-Moncada's silence or failure to provide any explanation to the police *after he was charged.* And Castro-Moncada does not identify anywhere in the record where the

12

subject of whether Castro-Moncada said anything to the police after he was charged was ever mentioned.

In context, we are persuaded that the comment, "He didn't reach out to the police giving this explanation about what happened," did not relate to the period of time after Castro-Moncada was charged and arrested. Rather, we conclude that the comment was in reference to the prosecutor's cross-examination questions of Castro-Moncada wherein the defendant acknowledged that during his June 22, 2015, interview he had not informed Detective Berg about two matters that defense counsel implied, in her closing argument, provided a motive for A.F.'s false, incriminating testimony.

First, defense counsel argued:

"That's just the beginning of the evidence that doesn't add up in this case. And [D.C.] admitted that at some times that she had had harsh words with [Castro-Moncada]. [Castro-Moncada] testified that she threatened him and that she thought that the money should go to the family, her family and probably her sisters, but not [Castro-Moncada].

". . . There was resentment there between the sisters and all of this was underlying."

The unstated inference from this defense argument was that because D.C. did not want Castro-Moncada to receive any of C.C.'s inheritance, she had a motive to enlist her daughter, A.F., in a plot to falsely allege that Castro-Moncada sexually assaulted her.

Second, for the first time at trial, Castro-Moncada testified that he had observed A.F. viewing pornography on the computer. The unstated probity of this evidence was to imply that A.F. based her knowledge of sexual behavior on viewing sex acts on pornographic websites, not viewing the pornographic DVD with Castro-Moncada or being the victim of sexual assaults. In closing argument, defense counsel referenced A.F.'s frequent computer use at her grandmother's home in arguing that she would not

13

visit the home frequently if she was being routinely raped. Defense counsel also pointed out, "[A.F.] went to her grandmother's house because there was a computer there that she could play on most of the weekend."

Given the prosecutor's cross-examination of Castro-Moncada about his failure to disclose to Detective Berg the two angry conversations D.C. had with Castro-Moncada, or seeing A.F. watching pornography on the computer, C.C.'s rebuttal testimony controverting Castro-Moncada's explanations, and defense counsel's reference to Castro-Moncada's explanations during her closing argument, we are persuaded that, in context, the prosecutor's rebuttal argument that Castro-Moncada "didn't reach out to the police giving this explanation about what happened" related to Detective Berg's interview prior to Castro-Moncada's arrest, not the time period after the defendant was charged.

Having discerned the factual basis for the prosecutor's comment, we next consider whether, in this context, the prosecutor's argument was error. Preliminarily, our review is severely complicated by Castro-Moncada's failure to provide an accurate and sufficient factual basis in the record on appeal. It is well-settled law that the party claiming an error has occurred has the burden of designating a record that affirmatively shows prejudicial error. Without such a record, an appellate court presumes the action of the trial court was proper. *State v. Sisson*, 302 Kan. 123, 128, 351 P.3d 1235 (2015). Critical to any analysis of a potential *Doyle* violation is an understanding of the circumstances surrounding the defendant's arrest, the advisement of *Miranda* rights, the defendant's invocation of the right to remain silent, and the nature of the law enforcement interaction with the defendant.

Castro-Moncada's failure to provide an accurate and sufficient factual record frustrates our legal analysis in several ways. First, Castro-Moncada informs us: "Officers *arrested* [Castro-Moncada] and questioned him about the allegations made by A.F. and N.P. [Castro-Moncada] denied ever touching either child in a sexual manner." (Emphasis

14

added.) In support of these factual statements Castro-Moncada only cites to the affidavit filed in support of his arrest. Yet, our reading of the affidavit reveals that it simply states: "I interviewed [Castro-Moncada] at the LEC. Post Miranda he denied sexually touching [A.F.] or [N.P.]." Of note, it does not appear this affidavit was ever admitted in evidence at trial or at a pretrial hearing.

Importantly, and not surprisingly, the affidavit in support of the issuance of the arrest warrant did not state that Castro-Moncada was under arrest at the time of the June 22, 2015 interview. Moreover, according to the record, the affidavit referenced by Castro-Moncada and the criminal complaint were filed on June 24, 2015—two days after the interview—and the arrest warrant was issued on the same day. Finally, the record contains a return on service memorializing the arrest of Castro-Moncada on June 26, 2015—four days after the interview. All things considered, it is apparent that—contrary to Castro-Moncada's representation in his appellant's brief—he was not under arrest or charged at the time of Detective Berg's interview.

The fact that Castro-Moncada was not under arrest at the time of the interview is important. As noted earlier, our *Doyle* precedent generally applies to the "time of arrest and after receiving *Miranda* warnings." *Hernandez*, 284 Kan. 74, Syl. ¶ 3; *State v. Heath*, 222 Kan. 50, 563 P.2d 418 (1977); *State v. Mims*, 220 Kan. 726, 730, 556 P.2d 387 (1976). The prosecutor's rebuttal argument related to the interview prior to Castro-Moncada's arrest, not an interview after his arrest and the filing of charges.

Second, the only factual support Castro-Moncada cites regarding the issue of *Miranda* warnings is the two word mention of "Post Miranda" in one sentence of the affidavit by Detective Berg. We reluctantly assume that "Post Miranda" means Detective Berg provided Castro-Moncada with some form of *Miranda* warnings prior to the interview. However, whether those rights were presented in oral and/or written form is unknown. We also do not know whether Castro-Moncada acknowledged understanding

15

his rights and/or whether he waived them. In short, Castro-Moncada has presented insufficient facts surrounding Detective Berg's interview to properly analyze the warnings and procedures employed in compliance with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Third, as mentioned earlier, *Doyle* generally prohibits a prosecutor from impeaching or commenting on an individual's silence upon arrest and after receiving *Miranda* warnings. Here, as conceded by Castro-Moncada, he never invoked his right to remain silent during the pre-arrest interview with Detective Berg. Moreover, at trial, Castro-Moncada testified the interview lasted about 10 minutes, and he denied the accusations of sexual misconduct. A recording or transcript of the interview was not introduced at trial. Nowhere in the record is found any reference that Castro-Moncada invoked his right to remain silent. Given that Castro-Moncada has presented no evidence that he invoked his right to remain silent, he has not presented sufficient facts to show a *Doyle* violation.

In summary, it is apparent that Castro-Moncada was not under arrest and had not invoked his right to remain silent at the time of Detective Berg's interview. The circumstances surrounding the "Post Miranda" statements that Castro-Moncada provided to Detective Berg are unknown. Given the state of the record on appeal, Castro-Moncada has failed to establish the necessary facts and circumstances to analyze, let alone establish, a *Doyle* violation in this case. It is the responsibility of the appellant to include a sufficient record in order to show prejudicial error. *Sisson*, 302 Kan. at 128. Castro-Moncada has failed in this regard. Castro-Moncada has failed to designate a record that sufficiently shows error.

*Claimed Error in Shifting the Burden of Proof*

Castro-Moncada also complains that the prosecutor's rebuttal closing argument improperly attempted to shift the burden of proof to him. The State counters that the prosecutor did not attempt to shift the burden of proof but was appropriately pointing out weaknesses in the defense case.

In Kansas, it is improper for the prosecutor to attempt to shift the burden of proof to the defendant or misstate the legal standard of the burden of proof, but prosecutors are afforded considerable latitude to address the weaknesses of the defense. The prosecutor's comments should also be evaluated in context. *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012).

Castro-Moncada notes the prosecutor's comment that "[a] defendant has the ability to subpoena anyone he wants to come testify." Castro-Moncada cites *State v. Williams*, 299 Kan. 911, 940, 329 P.3d 400 (2014), for the proposition that a prosecutor may argue the defendant's ability to subpoena witnesses when necessary to respond to defense counsel's inference that the State's failure to call a witness demonstrates that the witness would be favorable to the defense. 299 Kan. at 940. As correctly pointed out by Castro-Moncada, in the present case defense counsel made no such argument. Standing alone, this remark could constitute error.

Castro-Moncada also claims the prosecutor's comments about the lack of corroboration of Castro-Moncada's testimony regarding the innocent use of the bottle of lubrication and his receipt of the pornographic DVD also improperly shifted the burden of proof. In this regard, we note that the prosecutor specifically prefaced this argument by informing the jury, "*The Defendant doesn't have the burden in this case* but once he testifies you can evaluate his testimony like anyone else. His testimony didn't add up." (Emphasis added.) The prosecutor continued by pointing out that C.C. had controverted

17

Castro-Moncada's account regarding the use of lubrication to treat his heat rash and that under cross-examination Castro-Moncada modified his testimony regarding the receipt of the pornographic DVD from his unnamed friend.

"[A] prosecutor does not shift the burden of proof by pointing out the absence of evidence to support the defense argument that there are holes in the State's case." *State v. Pribble*, 304 Kan. 824, 837-38, 375 P.3d 966 (2016). As developed by defense counsel during closing argument, the overarching defense theory was that the girls' allegations were false. Defense counsel contended the State's evidence was insufficient and there were inconsistencies in the testimony of A.F. and N.P. regarding their timeline of events and the details of their allegations. Defense counsel also mentioned A.F.'s inconsistent testimony about where she found the pornographic DVD and discussed how Castro-Moncada's testimony explained that it was included with several CDs that a friend gave him. Additionally, defense counsel noted the lack of DNA evidence which suggested the absence of a sexual assault as described by A.F. Defense counsel concluded her arguments stating that the prosecution of Castro-Moncada was a "witch hunt."

In the context of defense counsel's argument, we view the prosecutor's remarks not as a comment on shifting the burden of proof but an argument highlighting the uncorroborated nature of Castro-Moncada's account which was offered in an effort to undercut the State's evidence, in particular the incriminating testimony of A.F. Viewed in this way, the prosecutor's comments were within the wide latitude afforded to prosecutors because the remarks did not call upon the defense to disprove the crime, rather the prosecutor responded to the defense's argument that the State's evidence was insufficient. See *State v. Duong*, 292 Kan. 824, 833, 257 P.3d 309 (2011) ("The prosecutor did not . . . call upon the defense to disprove the occurrence of a crime; the prosecutor only pointed out that the evidence supporting the defense theory of the case was thin.").

18

Moreover, the prosecutor's comments may be mitigated by jury instructions that provide the proper burden of proof. *Pepper*, 294 Kan. at 397. In this case, the district court instructed the jury venire: "[T]he State has the burden to prove that each of the allegations in the complaint did occur beyond a reasonable doubt. This burden never shifts to Mr. Castro-Moncada." At the conclusion of the trial, the district court provided the jury with Instruction No. 6 which stated in part: "The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty."

All things considered, we are persuaded that the prosecutor did not attempt to shift the burden of proof to the defense.

*Harmless Error*

In the interest of completeness, we will conduct a harmless error analysis, assuming for purposes of Castro-Moncada's claim of prosecutorial error that the challenged statements in the prosecutor's closing argument were outside the wide latitude afforded to the prosecutor.

In conducting this evaluation, we must decide whether the misconduct was so prejudicial that the defendant was denied a fair trial. *State v. Kemble,* 291 Kan. 109, 121-22, 238 P.3d 251 (2010). Because this issue involves Castro-Moncada's constitutional rights, we follow the traditional constitutional harmless error inquiry established in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). That inquiry provides:

> "[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt
> that the error complained of will not or did not affect the outcome of the trial in light of
> the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to
> the verdict.'" *Sherman*, 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6,
> 256 P.3d 801 [2011]).

19

Castro-Moncada asserts the prosecutor's argument was not harmless because the defendant's testimony supported a different conclusion and the comments diluted the jury's consideration of the evidence. Conversely, the State contends any error in the prosecutor's argumentation was harmless because the evidence of guilt was overwhelming.

Castro-Moncada's claims of error focusing on *Doyle* and burden shifting dealt with discrete items of physical or testimonial evidence—the bottle of JOH2O, the two angry conversations with D.C., and the pornographic DVD. At the outset, we question the significance of this evidence. Assuming Castro-Moncada's trial testimony about this evidence was true, it did not establish a defense or impeach the testimony of A.F. and N.P. For example, Castro-Moncada's explanation of how he obtained the JOH2O from an unnamed friend and used it every day to treat his heat rash may have been truthful, yet as A.F. testified, Castro-Moncada still used the lubrication for the additional purpose of facilitating her molestation. Similarly, Castro-Moncada's testimony that he had two angry conversations with D.C. about inheritance from C.C. may have been truthful, yet despite these two quarrels, A.F. and N.P. still could have been victims of sexual abuse. (In this regard, we pause to observe that Castro-Moncada never presented evidence—or a direct allegation—that D.C. encouraged A.F. and N.P. to testify falsely because of the inheritance dispute.)

In summary, the evidence at issue which the prosecutor argued was not disclosed to Detective Berg and was not supported by corroborating witnesses did not establish a defense to the criminal charges or impeach the testimony of A.F. and N.P. Castro-Moncada's trial testimony—his explanation of certain evidence—was incidental, and the prosecutor's attempt at impeachment did not factor in the critical question of whether Castro-Moncada committed the crimes.

Quite simply, on appeal Castro-Moncada fails to assert that his testimonial explanations, which the prosecutor attempted to impeach, were significant to the defense of this case, and their importance is not apparent to us. In this regard, we contrast the prosecutor's argument about this incidental evidence with Kansas cases wherein the *Doyle* issue was raised in the context of a prosecutor's questioning or argument about a defendant's nondisclosure about a misidentification, alibi, or consensual sex—all evidence of a complete defense. See *Duong*, 292 Kan. at 832-33 (Defendant alleged prosecutor improperly shifted the burden of proof to the defense by questioning defendant's failure to present evidence of misidentification.); *Heath*, 222 Kan. at 52-54 (prosecutor impermissibly referred to defendant's post-arrest silence to impeach his alibi testimony); *King,* 288 Kan. at 340 (prosecutor questioned defendant about post-arrest failure to disclose that sexual relations were consensual).

Another aspect of the harmless error inquiry is that the prosecutor's *argument* regarding Castro-Moncada's failure to disclose his explanations of certain evidence paled in importance when compared to the impeachment *evidence* regarding these matters that was presented by the State at trial. For example, C.C. provided compelling testimony refuting Castro-Moncada's testimony about the JOH2O lubrication, Castro-Moncada's claim that D.C. threatened to burn down the house with him in it, and Castro-Moncada's assertion that he once saw A.F. watching pornography on the computer.

Moreover, the jury was admonished in Instruction No. 4 about the importance of evidence in comparison to argumentation: "Statements, arguments and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." It is well established that "[j]urors are presumed to follow the instructions they receive in the district court." *State v. Mattox*, 305 Kan. 1015, Syl.

21

¶ 2, 390 P.3d 514 (2017). In this case, the State's evidence impeaching Castro-Moncada's trial explanations was probative and more important than the prosecutor's rebuttal argument. The prosecutor's argument was of diminished significance.

Finally, as detailed in the Factual and Procedural Background, there was considerable evidence to prove Castro-Moncada's guilt beyond a reasonable doubt. First, the circumstances which led A.F. to disclose her allegations based on her aunt's Facebook post that discussed her own experiences with sexual abuse were noteworthy for their spontaneity. At trial, all three daughters and their mother, C.C., corroborated the sudden and unexpected way the allegations were revealed.

Additionally, throughout the investigation and criminal proceeding, A.F. provided graphic details of Castro-Moncada's sexual abuse and descriptions of the pornographic DVD and bottle of JOH2O lubrication. A.F.'s testimony was corroborated by her pretrial interview and the fact that Detective Berg seized certain items in Castro-Moncada's home in places described by A.F. For her part, C.C. controverted Castro-Moncada's explanation regarding the JOH2O lubrication and disputed that D.C. threatened Castro-Moncada over C.C.'s intentions regarding her inheritance. Additionally, N.P. was also able to give a sufficiently detailed and consistent pretrial and trial account of her own encounter with Castro-Moncada.

Moreover, there was no showing that A.F. or N.P. harbored any bias, prejudice, or motive to lie in reporting their sexual abuse. On the contrary, at trial, Castro-Moncada answered, "Yes," when asked if he "[got] along" with A.F. and N.P. Finally, given that the cousins were 12 years of age at the time they testified, the jury was able to fully understand and evaluate their testimony, unlike more typical sexual assault cases wherein the victim is of tender years and unable to effectively communicate.

In summary, assuming prosecutorial error as alleged by Castro-Moncada, we conclude that the State has demonstrated beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict. *Sherman*, 305 Kan. at 109.

WITNESS SEQUESTRATION ORDER

Castro-Moncada asserts the "district court erred when it allowed [C.C.] to testify as a rebuttal witness after she had heard [Castro-Moncada's] testimony, in violation of the order of sequestration of witnesses." The State counters:

> "The trial court did not abuse its discretion in permitting [C.C.] to testify as a rebuttal witness after she had already testified for the State, been released from the defendant's subpoena, and remained in the courtroom during the defendant's testimony without objection, as there is no showing that her presence at trial resulted in any tailoring of her testimony."

Prior to trial, Castro-Moncada filed a motion to sequester witnesses during the jury trial. The district court granted the order. After D.C. and J.P. testified at trial, however, defense counsel agreed to allow the mothers to remain in the courtroom for their daughters' testimony in order to provide support for A.F. and N.P.

Towards the conclusion of the State's case-in-chief, C.C. testified. At the conclusion of cross-examination, defense counsel released C.C. from the subpoena stating, "And I know that we subpoenaed you but you're released from our subpoena." C.C. remained in the courtroom for the rest of the State's case-in-chief and the defense case.

23

After Castro-Moncada rested, the State called C.C. as a rebuttal witness. Defense counsel objected because C.C. was in the courtroom during Castro-Moncada's testimony and there was a sequestration order in place. The following colloquy occurred:

"Judge Rios: And the Court is aware that the parties were allowing victims and witnesses—you were asking the Court earlier to allow people to come back into the jury—into the courtroom after testimony had been provided. I know that it wasn't addressed specifically as to [C.C.] but it was as to the mother of the alleged victim and—

"[Defense Counsel]: This is a totally different situation, Judge, and I did not agree to this woman.

"Judge Rios: Okay.

"[Defense Counsel]: Violation of the sequestration order. I was doing that due to the fact that the child—it was child witness and I did not—I could, could have objected but I was trying to be gracious. But I certainly don't want—I understand the State's position on them and I was pretty sure that I was done with that witness on that—at that point. But this is a different situation.

"Judge Rios: I understand. I understand but the Defense did ask the Court earlier to relax its use of discretion, and in mandating the sequestration order in this case, I did relax that rule based on your request.

"[Defense Counsel]: It was the State's request, your Honor. I agreed to it.

"Judge Rios: As to—okay.

"[Defense Counsel]: It was not my request.

"Judge Rios: In any event should there have been an objection or a concern you could have raised that before the Court earlier. The Court's going to allow the witness to testify. Thank you."

Preliminarily, for the first time on appeal, Castro-Moncada asserts that the district court's ruling violated his constitutional right to a fair trial and an impartial jury. Prior to and during trial, however, Castro-Moncada did not raise a constitutional objection to the violation of the sequestration order. Rather, in his pretrial motion, Castro-Moncada cited to statutory law, K.S.A. 22-2903, as the basis for his request. "A defendant cannot object to the introduction of evidence on one ground at trial then assert another ground on

24

appeal." *State v. Richmond*, 289 Kan. 419, Syl. ¶ 4, 212 P.3d 165 (2009); *State v. Hollingsworth*, 289 Kan. 1250, Syl. ¶ 5, 221 P.3d 1122 (2009). As a result, we will only consider whether the trial court's ruling violated K.S.A. 22-2903.

K.S.A. 22-2903 provides:

"During the examination of any witnesses or when the defendant is making a statement or testifying the magistrate may, and on the request of the defendant or [S]tate shall, exclude all other witnesses. He may also cause the witnesses to be kept separate and to be prevented from communicating with each other until all are examined."

Kansas does not view witness sequestration as a right. *State v. Crum*, 286 Kan. 145, 161, 184 P.3d 222 (2008).

Accordingly, a trial court has the discretion to sequester a witness and may permit a witness to remain in the courtroom even when there is a sequestration order in place. *State v. Sampson*, 297 Kan. 288, 292, 301 P.3d 276 (2013). As a result, our court will review this issue to determine if there was an abuse of discretion. "A judicial action is an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." 297 Kan. at 292.

At the outset, the record shows that during the State's case-in-chief, defense counsel released C.C. from the defense subpoena. At this point, C.C. was under no obligation to testify as a witness at trial. It appears from the record that C.C. remained in the courtroom during the rest of the State's case and during the defense case-in-chief without defense counsel interposing any objection to a sequestration violation. As noted by the trial court, this failure to object was consistent with the courtesy afforded by defense counsel to D.C. and J.P. after their testimony.

25

Of particular relevance to this case, it is a "'well-established rule in Kansas . . . that [a] violation of a court order separating witnesses does not of itself disqualify a witness from testifying, and the trial court in its discretion may permit the witness to testify.'" *State v. Redick*, 307 Kan. 797, 805, 414 P.3d 1207 (2018). Here, we question whether there was a violation of the sequestration order given that C.C. had been released from the defendant's subpoena and the defense permitted two other witnesses to remain in the courtroom after their testimony.

Kansas courts have held that the purpose of sequestration is to prevent a witness from tailoring their testimony to that of earlier witnesses and it can aid in detecting whether testimony is less candid. 307 Kan. at 805-06. In the present case, C.C. was sequestered during the testimony of her daughters, granddaughters, and other State's witnesses. As a result, consistent with the purpose of the sequestration rule, C.C. was prevented from tailoring her testimony to corroborate or confirm the testimony of other State's witnesses. Given that C.C. was called as a rebuttal witness to impeach Castro-Moncada's testimony, there was no risk that she would corroborate or confirm his testimony in order to tailor her own testimony to his. Thus, the purpose of the sequestration rule was not violated. Moreover, with regard to the JOH2O bottle of lubrication, C.C.'s testimony on rebuttal was simply an explication of her testimony on direct examination. And her rebuttal testimony was not extensive, consisting of only eight transcript pages.

In summary, we discern no abuse of discretion by the trial court with regard to this issue. C.C. had been released from her legal obligation to testify and was, therefore, not necessarily covered by the sequestration order. With the acquiescence of defense counsel the sequestration order was not strictly enforced. Given that C.C.'s rebuttal testimony was contrary to Castro-Moncada's testimony, the purpose of the sequestration rule—to prevent witnesses from conferring and tailoring their testimony to be consonant with each other—was not violated. Finally, in ruling on this issue during Castro-Moncada's motion

26

for new trial, the trial court found, "The defendant has also not shown any prejudice directly to the defendant based upon the Court's discretionary allowance of that witness to testify." We agree. Even assuming error, we can find no prejudice warranting reversible error.

## MOTION TO SEVER CHARGES

Castro-Moncada contends that "[b]ecause the charges involving A.F. were not of the same character of those involving N.P., and the joinder of the charges was prejudicial to [Castro-Moncada], the district court erred in denying defense counsel's request to sever the charges for separate trials." The State counters that the charges were of the same or similar character because they were allegations of Castro-Moncada's sexual touching of his 12-year-old step-grandchildren, A.F. and N.P.

Before trial, Castro-Moncada filed a motion to sever counts one, two, three, and four from count five. Counts one through four charged Castro-Moncada with the rape of A.F., in violation of K.S.A. 21-3502(a)(2). Count 5 charged Castro-Moncada with aggravated indecent liberties with a child, N.P., in violation of K.S.A. 2014 Supp. 21-5506(b).

A hearing was held on the motion on January 6, 2017. The district judge ruled that the alleged sexual contacts by Castro-Moncada with A.F. and N.P. were

> "similar in nature and that they are both sexual acts against a child, same similar in age, they are cousins, they are related to [Castro-Moncada], who is the grandfather . . . .
>     . . . .
>     "THE COURT:  Step-grandparent. The allegations made by [A.F.] in Counts I through IV allege initially a similar touching that occurred for a lengthy period of time prior to the acts in which he is presently charged. . . . I believe that they're similar in

27

nature and [the] court does not believe [Castro-Moncada] would be prejudiced by having these counts tried together."

Castro-Moncada preserved this issue for appellate review.

Our standard of review provides that an appellate court should:

"'First, we consider whether K.S.A. 22-3203 permitted joinder. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) spells out the three conditions permitting the joining of multiple crimes in a single complaint. Whether one of the conditions is satisfied is a fact-specific inquiry, and we review the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. See *State v. Gaither*, 283 Kan. 671, 684-85, 156 P.3d 602 (2007).

"'Second, because K.S.A. 22-3202(1) provides that charges 'may' be joined, a district court retains discretion to deny a joinder request even if a statutory condition is met. We review this decision for an abuse of discretion. See *Gaither*, 283 Kan. at 685.

"'Finally, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice, *i.e.*, whether the error affected a party's substantial rights. K.S.A. 2012 Supp. 60-261.' *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013)." *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017).

K.S.A. 22-3203 provides:  "The court may order two or more complaints . . . against a single defendant to be tried together if the crimes could have been joined in a single complaint, information or indictment." K.S.A. 22-3202(1) states:

"Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

28

The district court ruled that the sex crimes committed against A.F. and N.P. were of the same or similar character. Although Castro-Moncada does not challenge the district court's factual findings in this regard, he contests the district court's legal conclusion. As just noted, we review this legal conclusion de novo. *Ritz*, 305 Kan. at 961.

Recently, our Supreme Court reiterated our longstanding general test for determining when joinder is appropriate:

> "'When all of the offenses are of the same general character, require the same mode of trial and the same kind of evidence, and occur in the same jurisdiction, the defendant may be tried upon several counts of one information or if separate informations have been filed they may be consolidated for trial at one and the same trial.' *State v. Crawford*, 255 Kan. 47, 53, 872 P.2d 293 (1994) (citing *State v. Ralls*, 213 Kan. 249, 256-57, 515 P.2d 1205 [1973])." *Ritz*, 305 Kan. at 962.

In applying this test to the offenses wherein A.F. was the alleged victim and the offense wherein N.P. was the alleged victim, we note several similarities:

First, the crimes rape of a child under the 14 years of age in violation of K.S.A. 21-3502(a)(2) and aggravated indecent liberties with a child under 14 years of age in violation of K.S.A. 2014 Supp. 21-5506(b) are similar in nature because they are sex crimes perpetrated against children under the age of 14 by an offender 18 years or over.

Second, as candidly conceded by Castro-Moncada on appeal, the crimes have identical and severe punishments—off grid life sentences with no eligibility for parole for 25 years. K.S.A. 2014 Supp. 21-6627(a)(1)(C); K.S.A. 2014 Supp. 21-5506(c)(3); K.S.A. K.S.A. 2010 Supp. 21-4643(a)(1)(B); K.S.A. 2010 Supp. 21-3502(c).

Third, the crimes required the same mode of trial—a felony jury trial.

Fourth, Castro-Moncada's modus operandi was similar in that his initial sexual assaults upon A.F. and N.P. began with lewd touching of their genital areas.

Fifth, proof of the crimes required the same or similar kinds of evidence. In particular:

- Because the only eyewitnesses to the crimes were A.F. and N.P., both victims were required to testify to establish the elements of the crimes.
- The defendant and victims were related. Castro-Moncada was the step-grandfather to both victims who were cousins.
- The discovery of the crimes against A.F. led to the disclosure of the crime against N.P.
- The disclosure of the crimes led family members C.C., D.C., and J.P. to become witnesses after they obtained relevant and probative evidence about the crimes and the victims' disclosures about them.
- A.F. and N.P. discussed the sexual assaults with each other after A.F.'s initial disclosure.
- Two witnesses possessed important information regarding both cases. A.F. and N.P. were interviewed by Goodall, a forensic interviewer with the DCF on June 19, 2015. Detective Berg interviewed Castro-Moncada regarding the alleged crimes against A.F. and N.P. on June 22, 2015.

Sixth, the crimes occurred in the same jurisdiction.

Seventh, Castro-Moncada's defense to all of the allegations was identical—a general denial of all charges.

30

All factors considered, applying the legal standards elucidated in *Ritz*, we are convinced the crimes alleged against A.F. and N.P. are of the same or similar character and, thus, established a prerequisite for joinder under K.S.A. 22-3202(1).

Castro-Moncada briefly suggests the joinder of the charges was an abuse of judicial discretion. He asserts: "The joinder prevented the jury from considering [Castro-Moncada's] guilt in the relative vacuum of whether he committed each charge individually." We are unaware of such precedent that would require individual charges to be considered in a vacuum and, therefore, effectively eliminate multiple count complaints in criminal cases.

On the other hand, we have independently reviewed the record on appeal—both as to the presentation of evidence and arguments by counsel—and this review does not show there was any suggestion that because Castro-Moncada was charged with certain crimes against one or the other victim that he necessarily committed the other crimes. Moreover, the State's dismissal of three counts of rape involving A.F. at the conclusion of the State's case left only two charges, not five, against Castro-Moncada for the jury's consideration. The State's dismissal of three rape charges showed as a practical matter that just because Castro-Moncada was charged with several sex crimes did not mean that his guilt with regard to individual crimes was in any way proven.

We discern no abuse of discretion in the district court's denial of Castro-Moncada's motion to sever the charges.

LIFETIME POSTRELEASE SUPERVISION

Finally, Castro-Moncada asserts the district court erred in sentencing him to an illegal sentence—lifetime postrelease supervision for his off-grid convictions. Castro-Moncada argues that a defendant sentenced under Jessica's Law may not receive a

31

lifetime postrelease supervision sentence. Castro-Moncada asserts that our court should vacate his sentence and remand for a new trial. The State agrees that the lifetime postrelease supervision sentence is illegal, but states that the appropriate relief is to vacate this portion of the sentence without remanding the case for a new trial. Our review is de novo. See *State v. Cash*, 293 Kan. 326, 330, 263 P.3d 786 (2011).

Our Supreme Court has held that a district court may not impose lifetime postrelease supervision when a defendant is serving a life sentence with eligibility for parole under the Jessica's Law statutory scheme. *State v. Harsh*, 293 Kan. 585, 589-90, 265 P.3d 1161 (2011). Accordingly, as to the lifetime postrelease supervision portion of his sentence, we find that Castro-Moncada received an illegal sentence. However, this error does not require us to remand for resentencing. See 293 Kan. at 589. We vacate the lifetime supervision portion of Castro-Moncada's sentence.

Affirmed in part and vacated in part.